# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 04-1568

_____

John Doe, I, on their own behalf and as   *
representatives of the class of all sex   *
offenders in the State of Iowa; John Doe,*
II, on their own behalf and as   *
representatives of the class of all sex   *
offenders in the State of Iowa; John Doe,*
III, on their own behalf and as   *
representatives of the class of all sex   *
offenders in the State of Iowa,   *
  *
      Appellees,   *
  *   Appeal from the United States
    v.   *   District Court for the Southern
  *   District of Iowa.
Tom Miller, Iowa Attorney General;   *
  *
      Appellant.   *
  *
J. Patrick White, as representatives   *
of the class of all county attorneys in   *
Iowa; Michael Wolf, as representatives   *
of the class of all county attorneys in   *
Iowa,   *
  *
      Defendants.   *

_____

Submitted: November 4, 2004
Filed: April 29, 2005

_____

Before RILEY, MELLOY, and COLLOTON, Circuit Judges.
_____

COLLOTON, Circuit Judge.

In 2002, in an effort to protect children in Iowa from the risk that convicted sex offenders may reoffend in locations close to their residences, the Iowa General Assembly passed, and the Governor of Iowa signed, a bill that prohibits a person convicted of certain sex offenses involving minors from residing within 2000 feet of a school or a registered child care facility. The district court declared the statute unconstitutional on several grounds and enjoined the Attorney General of Iowa and the ninety-nine county attorneys in Iowa from enforcing the prohibition.

Because we conclude that the Constitution of the United States does not prevent the State of Iowa from regulating the residency of sex offenders in this manner in order to protect the health and safety of the citizens of Iowa, we reverse the judgment of the district court. We hold unanimously that the residency restriction is not unconstitutional on its face. A majority of the panel further concludes that the statute does not amount to unconstitutional *ex post facto* punishment of persons who committed offenses prior to July 1, 2002, because the appellees have not established by the "clearest proof," as required by Supreme Court precedent, that the punitive effect of the statute overrides the General Assembly's legitimate intent to enact a nonpunitive, civil regulatory measure that protects health and safety.

I.

Iowa Senate File 2197, now codified at Iowa Code § 692A.2A, took effect on July 1, 2002. It provides that persons who have been convicted of certain criminal offenses against a minor, including numerous sexual offenses involving a minor, shall not reside within 2000 feet of a school or registered child care facility. Iowa Code

§ 692A.2A(1)-(2). The law does not apply to persons who established a residence prior to July 1, 2002, or to schools or child care facilities that are newly located after July 1, 2002. *Id.* § 692A.2A(4)(c). Violations of the statute are punishable as aggravated misdemeanors. Iowa Code § 692A.2A(3).[1]

---

[1] The text of the statute provides as follows:

692A.2A Residency restrictions – child care facilities and schools.

1. For purposes of this section, "person" means a person who has committed a criminal offense against a minor, or an aggravated offense, sexually violent offense, or other relevant offense that involved a minor.

2. A person shall not reside within two thousand feet of the real property comprising a public or nonpublic elementary or secondary school or a child care facility.

3. A person who resides within two thousand feet of the real property comprising a public or nonpublic elementary or secondary school, or a child care facility, commits an aggravated misdemeanor.

4. A person residing within two thousand feet of the real property comprising a public or nonpublic elementary or secondary school or a child care facility does not commit a violation of this section if any of the following apply:

   a. The person is required to serve a sentence at a jail, prison, juvenile facility, or other correctional institution or facility.

   b. The person is subject to an order of commitment under chapter 229A.

   c. The person has established a residence prior to [] July 1, 2002, or a school or child care facility is newly located on or [after] July 1, 2002.

Almost immediately after the law took effect, three named plaintiffs – sex offenders with convictions that predate the law's effective date – filed suit asserting that the statute is unconstitutional on its face. The district court certified their action as a class action, with a plaintiff class that includes all individuals to whom Iowa Code § 692A.2A applies who are currently living in Iowa or who wish to move to Iowa, except for any person who currently is the subject of a prosecution under § 692A.2A. The named plaintiffs, identified as various "John Does," had committed a range of sexual crimes, including indecent exposure, "indecent liberties with a child," sexual exploitation of a minor, assault with intent to commit sexual abuse, lascivious acts with a child, and second and third degree sexual abuse, all of which brought them within the provisions of the residency restriction. A defendant class, including all of Iowa's county attorneys, also was certified.

During a two-day bench trial, plaintiffs presented evidence concerning the enforcement of § 692A.2A, including maps that had been produced by several cities and counties identifying schools and child care facilities and their corresponding restricted areas. After viewing these maps and hearing testimony from a county attorney, the district court found that the restricted areas in many cities encompass the majority of the available housing in the city, thus leaving only limited areas within city limits available for sex offenders to establish a residence. In smaller towns, a single school or child care facility can cause all of the incorporated areas of the town to be off limits to sex offenders. The court found that unincorporated areas, small towns with no school or child care facility, and rural areas remained unrestricted, but

---

d. The person is a minor or a ward under a guardianship.

Iowa Code § 692A.2A. The term "residence" is defined as "the place where a person sleeps, which may include more than one location, and may be mobile or transitory." Iowa Code § 692A.1(8).

-4-

that available housing in these areas is "not necessarily readily available." *Doe v. Miller*, 298 F.Supp.2d 844, 851 (S.D. Iowa 2004).[2]

Plaintiffs also presented evidence of their individual experiences in seeking to obtain housing that complies with the 2000-foot restriction. Several of the plaintiffs, including John Does III, IV, XV, and XVIII, have friends or relatives with whom they would like to live, but whose homes are within 2000 feet of a school or child care facility. Many, such as John Does VII, X, XI, XII, XIII, XIV, and XVIII, live in homes that are currently compliant, either because they were established prior to July 1, 2002, or because the homes are outside the 2000-foot restricted areas. These plaintiffs, however, testified that they would like to be able to move into a restricted area. Still others, John Does II, VI, VIII, IX, XV, and XVI, are living in non-compliant residences that they wish to maintain.

Plaintiffs testified that in many cases they had a difficult time obtaining housing that was not within 2000 feet of a school or child care center. John Doe VII testified that he investigated 40 residences, but was unable to find any housing that would not place him in violation of § 692A.2A. The evidence also showed, however, that while the residency restriction may have exacerbated a housing problem for the plaintiffs, not all of their difficulty was caused by the statute. For example, John Doe II had difficulty finding housing in part because of his credit problems. John Doe XIV testified that the only available compliant housing in his hometown, Waterloo,

---

[2]The parties presented substantial evidence concerning the effect of the statute on the availability of housing for sex offenders in Carroll County, Iowa. The district court found that 2077 of 9019 residential units in the county (23 percent) were not in restricted areas. The Carroll County Attorney testified that 1694 of the available units were in unincorporated areas of the county, and were "mainly farmhouses," but he noted that the trend toward larger farms has created some vacancies in farmhouses where the party farming the land does not live in the farmhouse. Of the remaining 383 units available in the county, the district court found that 244 were located in towns without a school or child care facility. *Doe v. Miller*, 298 F.Supp.2d at 852.

-5-

was too expensive, so he and his wife purchased a rural home about 45 miles away. The mother of John Doe IV made efforts to help her son find housing, and she testified that she was able to find two potential residences for her son, but neither residence had any vacant units. John Doe VI was renting an apartment in compliance with § 692A.2A, but had to move out when the landlord decided that he did not want to rent to a sex offender. Similarly, John Does VIII and XI each found at least one possible compliant apartment, but their applications were denied because of their criminal records. In apparent contrast to this testimony from the plaintiffs, Dudley Allison, a parole and probation officer, testified that while the statute made it more difficult for sex offenders to find housing, "virtually everyone" among the covered parolees and probationers whom he supervised between July 2002 and July 2003 was able to locate housing in compliance with the statute. (T. Tr. at 285).

In addition to evidence regarding the burden that § 692A.2A places on sex offenders, both plaintiffs and defendants presented expert testimony about the potential effectiveness of a residency restriction in preventing offenses against minors. The State presented the testimony of Mr. Allison, a parole and probation officer who specialized in sex offender supervision. Allison described the process of treating sex offenders and his efforts at preventing recidivism by identifying the triggers for the original offense, and then imposing restrictions on the residences or activities of the offender. According to Allison, restrictions on the proximity of sex offenders to schools or other facilities that might create temptation to reoffend are one way to minimize the risk of recidivism. In the parole and probation context, Allison also has authority to limit offenders' activities in more specific ways, and he testified that he attempts to remove temptation by preventing offenders from working in jobs where they would have contact with potential victims or from living near parks or other areas where children might spend time unsupervised. In addition to the limits that he imposes on offenders under his supervision, Allison also testified that there is "a legitimate public safety concern" in where unsupervised sex offenders reside. In Allison's view, reoffense is "a potential danger forever."

The State also introduced the transcript of hearing testimony by Dr. William McEchron, a psychologist with a general practice that includes sex offender patients. Like Allison, Dr. McEchron testified that there is no cure for sex offenders and that "there are never any guarantees that they might not reoffend." In his view, the "biggest risk is what's going on inside the individual," but reducing the opportunity and the temptation to reoffend is extremely important to treatment. He explained that because there are "very high rates of re-offense for sex offenders who had offended against children," he believed it would be appropriate to restrict places where sex offenders might come into contact with children. He thought the appropriateness of such a restriction was "common sense," although he said there were insufficient data to know "where to draw the marks." Dr. McEchron also testified, however, that in his view, life-long restrictions like § 692A.2A do not aid in the treatment process, and could even foster negative attitudes toward authority and depression in offenders who view the law as unfair.

The plaintiffs offered the testimony of Dr. Luis Rosell, a psychologist with experience in sex offender treatment. Dr. Rosell estimated that the recidivism rate for sex offenders is between 20 and 25 percent, and like Allison and Dr. McEchron, stated his belief that the key to reducing the risk of recidivism is identifying the factors that led to the offender's original offense and then helping the offender to deal with or avoid those factors in the future. Dr. Rosell testified that reducing a specific sex offender's access to children was a good idea, and that "if you remove the opportunity, then the likelihood of reoffense is decreased." He did not believe, however, that "residential proximity makes that big of a difference." Moreover, Dr. Rosell thought that a 2000-foot limit was "extreme." Like Dr. McEchron, he worried that the law might be counterproductive to the offender's treatment goals by causing depression and potentially removing the offender from his "support system."

After hearing the testimony of all three experts and of the individual plaintiffs, the district court declared that § 692A.2A was unconstitutional on several grounds,

to wit: that it was an unconstitutional *ex post facto* law with respect to offenders who committed an offense prior to July 1, 2002; that it violated the plaintiffs' rights to avoid self-incrimination because, coupled with registration requirements elsewhere in Chapter 692A, it required offenders to report their addresses even if those addresses were not in compliance with § 692A.2A; that it violated procedural due process rights of the plaintiffs; and that it violated the plaintiffs' rights under the doctrine of substantive due process, because it infringed fundamental rights to travel and to "privately choose how they want to conduct their family affairs," and was not narrowly tailored to serve a compelling state interest. Although the district court believed the law was punitive, the court rejected the plaintiffs' final argument that the law imposed cruel and unusual punishment in violation of the Eighth Amendment. Having found the statute unconstitutional, the district court issued a permanent injunction against enforcement. *Doe v. Miller*, 298 F.Supp.2d at 880.

## II.

We first address the contention that § 692A.2A violates the rights of the covered sex offenders to due process of law under the Fourteenth Amendment. The appellees (to whom we will refer as "the Does") argue that the statute is unconstitutional because it fails to provide adequate notice of what conduct is prohibited, and because it does not require an individualized determination whether each person covered by the statute is dangerous. This claim relies on what is known as "procedural due process."

The Due Process Clause provides that no State shall deprive any person of life, liberty, or property without due process of law. The requirement of "due process" has led to the judicial doctrine of vagueness, which requires that a criminal statute "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357 (1983).

There is no argument here that the words of the statute are unconstitutionally vague. Rather, the Does contend that they are deprived of notice required by the Constitution because some cities in Iowa are unable to provide sex offenders with information about the location of all schools and registered child care facilities, and because it is difficult to measure the restricted areas, which are measured "as the crow flies" from a school or child care facility. We disagree that these potential problems render the statute unconstitutional on its face. A criminal statute is not vague on its face unless it is "impermissibly vague in all of its applications," *Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 497 (1982), and the possibility that an individual might be prosecuted in a particular case in a particular community despite his best efforts to comply with the restriction is not a sufficient reason to invalidate the entire statute. A sex offender subject to prosecution under those circumstances may seek to establish a violation of due process through a challenge to enforcement of the statute as applied to him in a specific case. Nor do we believe that the potential for varied enforcement of the restriction, which was cited by the district court, 298 F.Supp.2d at 878, justifies invalidating the entire regulatory scheme. Due process does not require that independently elected county attorneys enforce each criminal statute with equal vigor, and the existence of different priorities or prosecution decisions among jurisdictions does not violate the Constitution.

The Does also argue that § 692A.2A unconstitutionally forecloses an "opportunity to be heard" because the statute provides no process for individual determinations of dangerousness. This argument misunderstands the right to procedural due process. As the Supreme Court recently explained in connection with a comparable challenge to Connecticut's sex offender registration law, "even assuming, *arguendo,* that [the sex offender] has been deprived of a liberty interest, due process does not entitle him to a hearing to establish a fact that is not material under the [state] statute." *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003). States "are not barred by principles of '*procedural* due process' from drawing"

classifications among sex offenders and other individuals. *Id.* at 8 (quoting *Michael H. v. Gerald D.*, 491 U.S. 110, 120 (1989) (plurality opinion)) (emphasis in original).

We likewise conclude that the Iowa residency restriction does not contravene principles of procedural due process under the Constitution. The restriction applies to all offenders who have been convicted of certain crimes against minors, regardless of what estimates of future dangerousness might be proved in individualized hearings. Once such a legislative classification has been drawn, additional procedures are unnecessary, because the statute does not provide a potential exemption for individuals who seek to prove that they are not individually dangerous or likely to offend against neighboring schoolchildren. Unless the Does can establish that the *substantive* rule established by the legislative classification conflicts with some provision of the Constitution, there is no requirement that the State provide a process to establish an exemption from the legislative classification. *Id*. at 7-8. Thus, the absence of an individualized hearing in connection with a statute that offers no exemptions does not offend principles of procedural due process.

III.

The Does also assert that the residency restriction is unconstitutional under the doctrine of substantive due process. They rely on decisions of the Supreme Court holding that certain liberty interests are so fundamental that a State may not interfere with them, even with adequate procedural due process, unless the infringement is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301-02 (1993). The Does argue that several "fundamental rights" are infringed by Iowa's residency restriction, including the "right to privacy and choice in family matters," the right to travel, and "the fundamental right to live where you want." The district court agreed that § 692A.2A infringed upon liberty interests that constitute fundamental rights, applied strict scrutiny to the legislative classifications, and concluded that the statute was unconstitutional.

-10-

The Does first invoke "the right to personal choice regarding the family." They cite the Supreme Court's statement in *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984), that "certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme," and the Court's discussion of "marital privacy" in *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965). They also rely heavily on the Court's decision in *Moore v. City of East Cleveland*, 431 U.S. 494 (1977), which held unconstitutional a zoning ordinance that defined "family" in such a way as to prohibit a grandmother and her two grandsons from living together in an area designated for "single family" dwellings. A plurality of the Court in *Moore* reasoned that "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment," and concluded that the governmental interests advanced by the city were insufficient to justify an ordinance that "slic[ed] deeply into the family itself." *Id*. at 498-99 (plurality opinion). Justice Stevens concurred in the judgment on other grounds. *Id*. at 513-21.

We do not believe that the residency restriction of § 692A.2A implicates any fundamental right of the Does that would trigger strict scrutiny of the statute. In evaluating this argument, it is important to consider the Supreme Court's admonition that "'[s]ubstantive due process' analysis must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" *Flores*, 507 U.S. at 302 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). While the Court has not directed that an asserted right be defined at the most specific level of tradition supporting or denying the asserted right, *cf. Michael H. v. Gerald D.*, 491 U.S. at 127 n.6 (1989) (opinion of Scalia, J.), the Does' characterization of a fundamental right to "personal choice regarding the family" is so general that it would trigger strict scrutiny of innumerable laws and ordinances that influence "personal choices" made by families on a daily basis. The Supreme Court's decision in

-11-

*Griswold* and the plurality opinion in *Moore* did recognize unenumerated constitutional rights relating to personal choice in matters of marriage and family life, but they defined the recognized rights more narrowly, in terms of "intimate relation of husband and wife," *Griswold*, 381 U.S. at 482, or "intrusive regulation" of "family living arrangements." *Moore*, 431 U.S. at 499 (plurality opinion).

Unlike the precedents cited by the Does, the Iowa statute does not operate directly on the family relationship. Although the law restricts where a residence may be located, nothing in the statute limits who may live with the Does in their residences. The plurality in *Moore* emphasized this distinction, observing that the impact on family was "no mere incidental result of the ordinance," because "[o]n its face [the ordinance] selects certain categories of relatives who may live together and declares that others may not." 431 U.S. at 498-99 (plurality opinion). Thus, the reasoning of the *Moore* plurality does not require strict scrutiny of a regulation that has an incidental or unintended effect on the family, *Hameetman v. City of Chicago*, 776 F.2d 636, 643 (7th Cir. 1985) (upholding requirement that firemen reside within city limits), or that "affects or encourages decisions on family matters" but does not force such choices. *Gorrie v. Bowen*, 809 F.2d 508, 523 (8th Cir. 1987) (upholding regulation requiring that applications for public assistance for dependent children include siblings living in same household). Similarly, the Court in *Griswold* disclaimed authority to determine "the wisdom, need, and propriety" of all laws that touch social conditions, but held unconstitutional a state statute that "operate[d] directly on an intimate relation of husband and wife." 381 U.S. at 482.

While there was evidence that one adult sex offender in Iowa would not reside with his parents as a result of the residency restriction, that another sex offender and his wife moved 45 miles away from their preferred location due to the statute, and that a third sex offender could not reside with his adult child in a restricted zone, the statute does not directly regulate the family relationship or prevent any family member from residing with a sex offender in a residence that is consistent with the

-12-

statute. We therefore hold that § 692A.2A does not infringe upon a constitutional liberty interest relating to matters of marriage and family in a fashion that requires heightened scrutiny.

The Does also assert that the residency restrictions interfere with their constitutional right to travel. The modern Supreme Court has recognized a right to interstate travel in several decisions, beginning with *United States v. Guest*, 383 U.S. 745, 757-58 (1966), and *Shapiro v. Thompson*, 394 U.S. 618, 629-30 (1969). The Court subsequently explained that the federal guarantee of interstate travel "protects interstate travelers against two sets of burdens: 'the erection of actual barriers to interstate movement' and 'being treated differently' from intrastate travelers." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 (1993) (quoting *Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982)). Most recently, the Court summarized that the right to interstate travel embraces at least three different components: "the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999).

Although the district court, like some other courts, considered the first component of a right to interstate travel under the rubric of "substantive due process," the Supreme Court has not identified the textual source of that component. The Court has observed that the Articles of Confederation provided that "the people of each State shall have free ingress and regress to and from any other State," and suggested that this right "may simply have been 'conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created.'" *Id.* at 501 & n.3 (quoting *Guest*, 383 U.S. at 758). The latter two components of the right identified in *Saenz* arise from the Privileges and Immunities Clause of Article IV, § 2, and the Privileges or Immunities Clause of the Fourteenth Amendment. *Id.*

-13-

The Does argue that § 692A.2A violates this right to interstate travel by substantially limiting the ability of sex offenders to establish residences in any town or urban area in Iowa. They contend that the constitutional right to travel is implicated because the Iowa law deters previously convicted sex offenders from migrating from other States to Iowa. The district court agreed, reasoning that the statute "effectively bans sex offenders from residing in large sections of Iowa's towns and cities." 298 F.Supp.2d at 874.

We respectfully disagree with this analysis. The Iowa statute imposes no obstacle to a sex offender's entry into Iowa, and it does not erect an "actual barrier to interstate movement." *Bray*, 506 U.S. at 277 (internal quotation omitted). There is "free ingress and regress to and from" Iowa for sex offenders, and the statute thus does not "directly impair the exercise of the right to free interstate movement." *Saenz*, 526 U.S. at 501. Nor does the Iowa statute violate principles of equality by treating nonresidents who visit Iowa any differently than current residents, or by discriminating against citizens of other States who wish to establish residence in Iowa. We think that to recognize a fundamental right to interstate travel in a situation that does not involve any of these circumstances would extend the doctrine beyond the Supreme Court's pronouncements in this area. That the statute may deter some out-of-state residents from traveling to Iowa because the prospects for a convenient and affordable residence are less promising than elsewhere does not implicate a fundamental right recognized by the Court's right to travel jurisprudence.[3]

_____

[3]In its analysis of the right to interstate travel, the district court also expressed concern that a sex offender might be compelled to avoid Iowa altogether, lest he establish an unlawful residence by "unwittingly falling asleep" at a location within 2000 feet of a school or child care facility. 298 F.Supp.2d at 875. The court stated that "[l]iteral application of the Act would result in the great majority of the State's hotels and motels being restricted to traveling sex offenders," and that "community centers such as homeless shelters and missions will most likely be unavailable to sex offenders because of location." *Id*. This led the court to conclude that "sex offenders would appear to be able to travel to Iowa freely only so long as they do not stop." *Id*.

-14-

The Does also assert that § 692A.2A infringes upon a fundamental constitutional right to *intra*state travel. The Supreme Court has not decided whether there is a fundamental right to intrastate travel, *see Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 255-56 (1974), although it observed long ago that under the Articles of Confederation, state citizens "possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom." *United States v. Wheeler*, 254 U.S. 281, 293 (1920). During the same era, the Court also commented that "the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty . . . secured by the 14th Amendment," *Williams v. Fears*, 179 U.S. 270, 274 (1900), but as the Third Circuit observed, "[i]t is unclear whether the travel aspect of cases like *Fears* can be severed from the general spirit of *Lochner v. New York*, 198 U.S. 45 (1905), now thoroughly discredited, that was so prominent in the substantive due process analysis of that period." *Lutz v. City of York*, 899 F.2d 255, 266 (3d Cir. 1990).

Some of our sister circuits have recognized a fundamental right to intrastate travel in the context of a "drug exclusion zone" that banned persons from an area of a city for a period of time, *Johnson v. City of Cincinnati*, 310 F.3d 484, 496-98 (6th Cir. 2002), an ordinance that outlawed "cruising" and thus limited the ability of persons to drive on certain major public roads, *Lutz*, 899 F.2d at 268, and a law that

We question whether these concerns are even applicable to the plaintiffs, given that the plaintiff class was defined as those sex offenders "currently living" in Iowa or "might wish to live" in Iowa, not vacationers or cross-country travelers. *Id*. at 847. In any event, the Does do not rely on these factual assertions in defending the judgment of the district court, and we do not find evidence in the record that would support a specific finding about the proximity of hotels, motels, homeless shelters, and missions throughout Iowa to schools and child care facilities.

-15-

created a durational residency requirement as a condition of eligibility for public housing. *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 647-48 (2d Cir. 1971). The Second Circuit, for example, reasoned that it would be "meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." *Id.* at 648; *see also Johnson*, 310 F.3d at 497 n.4; *Lutz*, 899 F.2d at 261. Other decisions have held that there is *no* fundamental right to intrastate travel in the context of a bona fide residency requirement imposed as a condition of municipal employment. *Andre v. Bd. of Trs. of Maywood*, 561 F.2d 48, 52-53 (7th Cir. 1977); *Wardwell v. Bd. of Educ.*, 529 F.2d 625, 627 (6th Cir. 1976); *Wright v. City of Jackson*, 506 F.2d 900, 901-02 (5th Cir. 1975); *see also Doe v. City of Lafayette*, 377 F.3d 757, 770-71 (7th Cir. 2004) (en banc) (holding that city's ban of sex offender from all public parks did not implicate fundamental right to intrastate travel, where offender was "not limited in moving from place to place within his locality to socialize with friends and family, to participate in gainful employment or to go to the market to buy food and clothing"); *Hutchins v. District of Columbia*, 188 F.3d 531, 538-39 (D.C. Cir. 1999) (en banc) (holding that there is no fundamental right for juveniles to be in a public place without adult supervision during curfew hours).

We find it unnecessary in this case to decide whether there is a fundamental right to intrastate travel under the Constitution, because assuming such a right is recognized, it would not require strict scrutiny of § 692A.2A. The district court and the Does cite the Sixth Circuit's decision in *Johnson* for the proposition that there is a fundamental right to intrastate travel. Accepting that view for purposes of analysis, we believe that any fundamental right to intrastate travel would likely be "correlative" to the right to interstate travel discussed in *Saenz*, *see Johnson*, 310 F.3d at 497 n.4, or would consist of a "right to travel locally through public spaces and roadways." *Id.* at 498. Therefore, the Iowa statute would not implicate a right to intrastate travel for the same reasons that it does not implicate the right to interstate travel. The Iowa residency restriction does not prevent a sex offender from entering or leaving any part

of the State, including areas within 2000 feet of a school or child care facility, and it does not erect any actual barrier to intrastate movement. In this sense, the Iowa law is comparable to the municipal residency requirements that have been held to implicate no fundamental right to intrastate travel in *Andre*, *Wardwell* and *Wright*, and less restrictive on freedom of movement than the ban on access to public parks upheld under rational basis review in *Doe v. City of Lafayette*. By contrast, the decisions finding infringement of a fundamental right to intrastate travel have involved laws that trigger concerns not present here – interference with free ingress to and egress from certain parts of a State (*Johnson* and *Lutz*) or treatment of new residents of a locality less favorably than existing residents (*King*).

The Does also urge that we recognize a fundamental right "to live where you want." This ambitious articulation of a proposed unenumerated right calls to mind the Supreme Court's caution that we should proceed with restraint in the area of substantive due process, because "[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Some thirty years ago, our court said "we cannot agree that the right to choose one's place of residence is necessarily a fundamental right," *Prostrollo v. Univ. of S.D.*, 507 F.2d 775, 781 (8th Cir. 1974), and we see no basis to conclude that the contention has gained strength in the intervening years. The Supreme Court recently has restated its reluctance to "expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended," *Glucksberg*, 521 U.S. at 720 (quoting *Collins*, 503 U.S. at 125), and the Does have not developed any argument that the right to "live where you want" is "deeply rooted in this Nation's history and tradition," *id*. at 721 (quoting *Moore*, 431 U.S. at 503 (plurality opinion)) or "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if [it] were sacrificed." *Id*. (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 326 (1937)). We are thus not persuaded that the

Constitution establishes a right to "live where you want" that requires strict scrutiny of a State's residency restrictions.

Because § 692A.2A does not implicate a constitutional liberty interest that has been elevated to the status of "fundamental right," we review the statute to determine whether it meets the standard of "rationally advancing some legitimate governmental purpose." *Flores*, 507 U.S. at 306. The Does acknowledge that the statute was designed to promote the safety of children, and they concede that this is a legitimate state interest. They also allow that perhaps "certain identifiable sex offenders should not live right across the street from a school or perhaps anywhere else where there are children." (Appellees' Br. at 51). The Does contend, however, that the statute is irrational because there is no scientific study that supports the legislature's conclusion that excluding sex offenders from residing within 2000 feet of a school or child care facility is likely to enhance the safety of children.

We reject this contention because we think it understates the authority of a state legislature to make judgments about the best means to protect the health and welfare of its citizens in an area where precise statistical data is unavailable and human behavior is necessarily unpredictable. Although the Does introduced one report from the Minnesota Department of Corrections finding "no evidence in Minnesota that residential proximity of sex offenders to schools or parks affects reoffense," this solitary case study – which involved only thirteen reoffenders released from prison between 1997 and 1999 – does not make irrational the decision of the Iowa General Assembly and the Governor of Iowa to reach a different predictive judgment for Iowa. As the district court observed, twelve other States have enacted some form of residency restriction applicable to sex offenders.[4] There can be no doubt of a

---

[4]*See* Ala. Code § 15-20-26(a) ("Unless otherwise exempted by law, no adult criminal sex offender shall establish a residence or accept employment within 2,000 feet of the property on which any school or child care facility is located."); Ark. Code Ann. § 5-14-128(a) ("It shall be unlawful for a sex offender who is required to

-18-

legislature's rationality in believing that "[s]ex offenders are a serious threat in this Nation," and that "[w]hen convicted sex offenders reenter society, they are much

register . . . and who has been assessed as a Level 3 or Level 4 offender to reside within two thousand feet (2000') of the property on which any public or private elementary or secondary school or daycare facility is located." ); Cal. Penal Code § 3003(g) ([A]n inmate who is released on parole for any violation of [sections prohibiting lewd or lascivious acts, or continued sexual abuse of a child] shall not be placed or reside . . . within one one-quarter mile of any public or private school."); Fla. Stat. Ann. § 947.1405(7)(a)(2) ("Any inmate convicted of [certain sexual crimes against minors] and . . . subject to conditional release supervision . . . [is prohibited from] living within 1,000 feet of a school, day care center, park, playground, designated public school bus stop or other place where children regularly congregate."); Ga. Code Ann. § 42-1-13(b) ("No individual required to register . . . shall reside within 1,000 feet of any child care facility, school, or area where minors congregate."); 720 Ill. Comp. Stat. § 5/11-9.3(b-5) ("It is unlawful for a child sex offender to knowingly reside within 500 feet of a school building . . ."); Ky. Rev. Stat. Ann. § 17.495 ("No registrant . . . who is placed on probation, parole, or any form of supervised release, shall reside within one thousand (1,000) feet of a high school, middle school, elementary school, preschool, or licensed day care facility."); La. Rev. Stat. § 14:91.1(A)(2) ("Unlawful presence of a sexually violent predator is . . . the physical residing of a sexually violent predator within one thousand feet of any public or private, elementary or secondary school, a day care facility, playground, public or private youth center, public swimming pool, or free standing video arcade facility."); Ohio Rev. Code Ann. § 2950.031(A) ("No person who has been convicted of . . . either a sexually oriented offense that is not a registration-exempt sexually oriented offense or a child-victim oriented offense shall establish a residence or occupy residential premises within one thousand feet of any school premises."); Okl. Stat. tit. 57, § 590 ("It is unlawful for any person registered pursuant to the Oklahoma Sex Offenders Registration Act to reside within a two thousand-foot radius of any public or private school site or educational institution."); Or. Rev. Stat. § 144.642(1)(a) (Rules for post-prison supervision or parole "shall include . . .a general prohibition against allowing a sex offender to reside near locations where children are the primary occupants or users."); Tenn. Code Ann. § 40-39-211(a) ("No sexual offender, . . . or violent sexual offender, . . . shall knowingly reside or work within one thousand feet (1,000') of the property on which any public school, private or parochial school, licensed day care center, or any other child care facility is located.").

more likely than any other type of offender to be re-arrested for a new rape or sexual assault." *Conn. Dep't of Pub. Safety*, 538 U.S. at 4 (alterations in original) (quoting *McKune v. Lile*, 536 U.S. 24, 32-33 (2002) (plurality opinion)). The only question remaining is whether, in view of a rationally perceived risk, the chosen residency restriction rationally advances the State's interest in protecting children.

We think the decision whether to set a limit on proximity of "across the street" (as appellees suggest), or 500 feet or 3000 feet (as the Iowa Senate considered and rejected, *see* S. Journal 79, 2d Sess., at 521 (Iowa 2002)), or 2000 feet (as the Iowa General Assembly and the Governor eventually adopted) is the sort of task for which the elected policymaking officials of a State, and not the federal courts, are properly suited. The legislature is institutionally equipped to weigh the benefits and burdens of various distances, and to reconsider its initial decision in light of experience and data accumulated over time. The State of Alabama, for example, originally adopted a residency restriction of 1000 feet, but later increased the distance to 2000 feet, Ala. Code § 15-20-26(a); *see also* 2000 Ala. Acts 728, §1; 1999 Ala. Acts 572, § 3, while the Minnesota legislature apparently followed the recommendation of the State's Department of Corrections that no blanket proximity restriction should be adopted. (Appellee's App. at 338). Where individuals in a group, such as convicted sex offenders, have "distinguishing characteristics relevant to interests the State has authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441-42 (1985).

The record does not support a conclusion that the Iowa General Assembly and the Governor acted based merely on negative attitudes toward, fear of, or a bare desire to harm a politically unpopular group. *Cf. Cleburne*, 473 U.S. at 448; *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Sex offenders have a high rate of recidivism, and the parties presented expert testimony that reducing opportunity and temptation is important to minimizing the risk of reoffense. Even experts in the field could not predict with confidence whether a particular sex offender will reoffend, whether an

offender convicted of an offense against a teenager will be among those who "cross over" to offend against a younger child, or the degree to which regular proximity to a place where children are located enhances the risk of reoffense against children. One expert in the district court opined that it is just "common sense" that limiting the frequency of contact between sex offenders and areas where children are located is likely to reduce the risk of an offense. (Appellant's App. at 165). The policymakers of Iowa are entitled to employ such "common sense," and we are not persuaded that the means selected to pursue the State's legitimate interest are without rational basis.

IV.

The Does next argue that the residency restriction, "in combination with" the sex offender registration requirements of § 692A.2, unconstitutionally compels sex offenders to incriminate themselves in violation of the Fifth and Fourteenth Amendments. The district court concluded that a sex offender who establishes residence in a prohibited area must either register his current address, thereby "explicitly admit[ting] the facts necessary to prove the criminal act," or "refuse to register and be similarly prosecuted." 298 F.Supp.2d at 879. The court then held that § 692A.2A "unconstitutionally requires sex offenders to provide incriminating evidence against themselves," and enjoined enforcement of the residency restriction on this basis as well.

We disagree that the Self-Incrimination Clause of the Fifth Amendment renders the residency restriction of § 692A.2A unconstitutional. Our reason is straightforward: the residency restriction does not compel a sex offender to be a witness against himself or a witness of any kind. The statute regulates only where the sex offender may reside; it does not require him to provide any information that might be used against him in a criminal case. A *separate* section of the Iowa Code, § 692A.2, requires a sex offender to register his address with the county sheriff. The Does have not challenged the constitutionality of the registration requirement, or sought an injunction against its enforcement, and whatever constitutional problem

-21-

may be posed by the registration provision does not justify invalidating the residency restriction.

None of the authorities cited by the Does supports invalidation of a substantive rule of law because a reporting or registration requirement allegedly compels a person in violation of that substantive rule to incriminate himself. The Supreme Court held in *Marchetti v. United States*, 390 U.S. 39 (1968), and *Grosso v. United States*, 390 U.S. 62 (1968), that a gambler was privileged under the Fifth Amendment not to register his occupation as one in the business of accepting wagers, not to pay the required occupational tax, and not to pay a wagering excise tax, because these submissions would create a real and appreciable hazard of self-incrimination for the gambler. The Court never suggested, however, that the Self-Incrimination Clause prevented the government from criminalizing wagering or gambling. Similarly, in *Leary v. United States*, 395 U.S. 6 (1969), the Court's holding that a plea of self-incrimination was a complete defense in a prosecution for non-compliance with provisions requiring payment of a tax on marijuana imported into the United States did not imply that state laws prohibiting the possession of marijuana were somehow unconstitutional. *Id.* at 29. And in *Albertson v. Subversive Activities Control Board*, 382 U.S. 70 (1965), where the Court held unconstitutional under the Fifth Amendment a requirement that members of the Communist Party file a registration statement with the Attorney General, it was never intimated that the registration requirement rendered unconstitutional Section 4(a) of the Subversive Activities Control Act, under which Albertson might have been prosecuted as a result of the registration.

Even had the Does challenged the sex offender registration statute, moreover, we believe that a self-incrimination challenge to the registration requirements would not be ripe for decision. Unlike *Albertson*, where the petitioners had asserted the privilege against self-incrimination on multiple occasions, the Attorney General of the United States had rejected their claims, and specific orders requiring the petitioners to register had been issued, 382 U.S. at 75, the process with respect to enforcement of the Iowa sex offender registration statute in conjunction with the

residency restriction is far less developed.  The record does not show whether any of the plaintiffs has registered with the county sheriff an address that is prohibited by § 692A.2A, whether any of the county attorneys or the Attorney General would seek to use registration information to further a criminal prosecution for violation of the residency restriction (rather than merely as a regulatory mechanism to bring sex offenders into compliance with the statute),[5] or whether the prosecuting authorities would recognize a refusal to register as a valid assertion of the privilege against self-incrimination (and thus decline to prosecute a sex offender for failing to register a prohibited residence).

We think that under these circumstances, a self-incrimination challenge to the registration statute would be premature.  *See Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 106-10 (1961); *cf. Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841, 858 (1984).  If and when there is a prosecution for violation of the residency restriction in which the prosecution makes use of a sex offender's registration, a prosecution for failure to register a prohibited address, or some other basis such as in *Albertson* to say that the dispute is ripe, then the self-incrimination issue will be joined.  It would then be appropriate to consider such questions as whether the registration requirement as applied falls under the rule of cases such as *Marchetti* and *Albertson*, where the Fifth Amendment was held to prohibit incriminating registration or reporting requirements directed at persons "inherently suspect of criminal activities," *Albertson*, 382 U.S. at 79, or whether the public need for information about convicted sex offenders and the noncriminal regulatory purpose for securing the information might permit enforcement of the requirement consistent with the Fifth Amendment.  *Cf. Baltimore City Dep't of Soc. Servs. v. Bouknight*, 493 U.S. 549, 557-59 (1990); *California v. Byers*, 402 U.S. 424, 431-34 (1971) (plurality opinion); *id*. at 457-58 (Harlan, J., concurring in the

---

[5]There is evidence in the record that some Iowa law enforcement authorities, rather than immediately file charges against an offender found to be residing in a restricted zone, have withheld charges while the offender sought housing in an unrestricted area.  (T. Tr. at 229).

judgment).  At this point, we conclude that the Does' self-incrimination claim is both misdirected and premature.

V.

A final, and narrower, challenge advanced by the Does is that § 692A.2A is an unconstitutional *ex post facto* law because it imposes retroactive punishment on those who committed a sex offense prior to July 1, 2002.  The *Ex Post Facto* Clause of Article I, Section 10 of the Constitution prohibits the States from enacting laws that increase punishment for criminal acts after they have been committed.  *See generally Calder v. Bull*, 3 U.S. 386, 390 (1798) (Chase, J., seriatim).  In determining whether a state statute violates the *Ex Post Facto* Clause by imposing such punishment, we apply the framework outlined in *Smith v. Doe*, 538 U.S. 84, 92 (2003), where the Supreme Court considered an *ex post facto* challenge to an Alaska statute requiring sex offenders to register.  Under that framework, we must first "ascertain whether the legislature meant the statute to establish 'civil' proceedings."  *Id*. (internal quotation omitted).  If the legislature intended criminal punishment, then the legislative intent controls the inquiry and the law is necessarily punitive.  *Id*.  If, however, the legislature intended its law to be civil and nonpunitive, then we must determine whether the law is nonetheless "so punitive either in purpose or effect as to negate" the State's nonpunitive intent.  *Id.* (internal quotations and citations omitted).  "[O]nly the clearest proof" will transform what the legislature has denominated a civil regulatory measure into a criminal penalty.  *Id.*

The district court found that in passing the residency restriction of § 692A.2A, the Iowa General Assembly intended to create "a civil, non-punitive statutory scheme to protect the public."  298 F.Supp.2d at 868.  The Does do not dispute this conclusion on appeal, and we agree that the legislature's intent was not punitive.  Although Iowa Code § 692A.2A does not contain any clear statement of purpose, the residency restriction is codified as part of Chapter 692A, together with a registration system that the Supreme Court of Iowa has declared to have a purpose of "protect[ing] society" and to be a nonpunitive, regulatory law.  *In Interest of S.M.M.*,

558 N.W.2d 405, 408 (Iowa 1997); *State v. Pickens,* 558 N.W.2d 396, 400 (Iowa 1997). "[W]here a legislative restriction is an incident of the State's power to protect the health and safety of its citizens, it will be considered as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment." *Smith v. Doe,* 538 U.S. at 93-94 (quoting *Flemming v. Nestor,* 363 U.S. 603, 616 (1960)) (internal marks omitted). We believe the available evidence leads most naturally to the inference that the restrictions in § 692A.2A are intended, like the restrictions elsewhere in the same chapter, to protect the health and safety of Iowa citizens. Therefore, we conclude that the purpose of the Iowa General Assembly in passing this law was regulatory and non-punitive.

We must next consider whether the Does have established that the law was nonetheless so punitive in effect as to negate the legislature's intent to create a civil, non-punitive regulatory scheme. In this inquiry, we refer to what the Supreme Court described in *Smith v. Doe* as "useful guideposts" for determining whether a law has a punitive effect. In analyzing the effect of the Alaska sex offender registration law, the Court in *Smith* pointed to five factors drawn from *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-69 (1963), as particularly relevant: whether the law has been regarded in our history and traditions as punishment, whether it promotes the traditional aims of punishment, whether it imposes an affirmative disability or restraint, whether it has a rational connection to a nonpunitive purpose, and whether it is excessive with respect to that purpose. *Smith v. Doe,* 538 U.S. at 97. These factors are "neither exhaustive nor dispositive," *id.* (quotation omitted), and while we consider them as an aid to our analysis, we bear in mind that the ultimate question always remains whether the punitive effects of the law are so severe as to constitute the "clearest proof" that a statute intended by the legislature to be nonpunitive and regulatory should nonetheless be deemed to impose *ex post facto* punishment.

Turning first to any historical tradition regarding residency restrictions, the Does argue that § 692A.2A is the effective equivalent of banishment, which has been regarded historically as a punishment. *See Smith v. Doe*, 538 U.S. at 98. Banishment has been defined as "'punishment inflicted on criminals by compelling them to quit

a city, place, or country for a specified period of time, or for life,'" *United States v. Ju Toy*, 198 U.S. 253, 269-70 (1905) (Brewer, J., dissenting) (quoting *Black's Law Dictionary*), or "expulsion from a country." *Black's Law Dictionary* 154, 614 (8th ed. 2004). The Supreme Court most recently explained that banished offenders historically could not "return to their original community," and that the banishment of an offender "expelled him from the community." *Smith v. Doe*, 538 U.S. at 98; *see also Fong Yue Ting v. United States*, 149 U.S. 698, 730 (1893) (holding that order of deportation is "not a banishment, in the sense in which that word is often applied to the expulsion of a citizen from his country by way of punishment").

While banishment of course involves an extreme form of residency restriction, we ultimately do not accept the analogy between the traditional means of punishment and the Iowa statute. Unlike banishment, § 692A.2A restricts only where offenders may reside. It does not "expel" the offenders from their communities or prohibit them from accessing areas near schools or child care facilities for employment, to conduct commercial transactions, or for any purpose other than establishing a residence. With respect to many offenders, the statute does not even require a change of residence: the Iowa General Assembly included a grandfather provision that permits sex offenders to maintain a residence that was established prior to July 1, 2002, even if that residence is within 2000 feet of a school or child care facility. Iowa Code § 692A.2A(4)(c). The district court, moreover, found that residency restrictions for sex offenders "are relatively new and somewhat unique," 298 F. Supp. 2d at 849 n.4, and as with sex offender registration laws, which also were of "fairly recent origin," *Smith v. Doe*, 538 U.S. at 97 (internal quotation omitted), this novelty "suggests that the statute was not meant as a punitive measure, or, at least, that it did not involve a traditional means of punishing." *Id.* We thus conclude that this law is unlike banishment in important respects, and we do not believe it is of a type that is traditionally punitive.

The second factor that we consider is whether the law promotes the traditional aims of punishment – deterrence and retribution. *Smith v. Doe*, 538 U.S. at 102. The district court found that the law was both deterrent and retributive, and thus weighed

this factor in favor of its finding that the law was punitive. We agree with the district court that the law could have a deterrent effect, but we do not agree that the deterrent effect provides a strong inference that the restriction is punishment. The primary purpose of the law is not to alter the offender's incentive structure by demonstrating the negative consequences that will flow from committing a sex offense. The Iowa statute is designed to reduce the likelihood of reoffense by limiting the offender's temptation and reducing the opportunity to commit a new crime. We observe, moreover, that the Supreme Court has cautioned that this factor not be over-emphasized, for it can "prove[] too much," as "[a]ny number of governmental programs might deter crime without imposing punishment." *Id.*

The statute's "retributive" effect is similarly difficult to evaluate. For example, while the Ninth Circuit found punishment where the length of sex offender reporting requirements corresponded to the degree of wrongdoing rather than the extent of the risk imposed, *Doe I v. Otte*, 259 F.3d 979, 990 (9th Cir. 2001), *rev'd sub nom. Smith v. Doe*, 538 U.S. 84 (2003), the Supreme Court disagreed, and instead emphasized that the reporting requirements were "reasonably related to the danger of recidivism" in a way that was "consistent with the regulatory objective." *Smith v. Doe,* 538 U.S. at 102. While any restraint or requirement imposed on those who commit crimes is at least potentially retributive in effect, we believe that § 692A.2A, like the registration requirement in *Smith v. Doe*, is consistent with the legislature's regulatory objective of protecting the health and safety of children.

The next factor we consider is whether the law "imposes an affirmative disability or restraint." Imprisonment is the "paradigmatic" affirmative disability or restraint, *Smith v. Doe,* 538 U.S. at 100, but other restraints, such as probation or occupational debarment, also can impose some restriction on a person's activities. *Id.* at 100-01. While restrictive laws are not necessarily punitive, they are more likely to be so; by contrast, "[i]f the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Id.* at 100. For example, sex offender registration laws, requiring only periodic reporting and updating of personal information, do not have a punitive restraining effect. *Id.* at 102. At the same time, civil commitment of the

-27-

mentally ill, though extremely restrictive and disabling to those who are committed, does not necessarily impose punishment because it bears a reasonable relationship to a "legitimate nonpunitive objective," namely protecting the public from mentally unstable individuals. *Hendricks*, 521 U.S. at 363.

Iowa Code § 692A.2A is more disabling than the sex offender registration law at issue in *Smith v. Doe*, which had not "led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred through the use of routine background checks by employers and landlords." 538 U.S. at 100. Although the Does did not present much evidence about housing within restricted areas that would have been available to them absent the statute, they did show that some sex offenders would have lived with spouses or parents who owned property in the restricted zones, and some sex offenders were living in residences within restricted areas that were permitted under the statute's "grandfather" provision. The residency restriction is certainly less disabling, however, than the civil commitment scheme at issue in *Hendricks*, which permitted complete confinement of affected persons. In both *Smith* and *Hendricks*, the Court considered the degree of the restraint involved in light of the legislature's countervailing nonpunitive purpose, and the Court in *Hendricks* emphasized that the imposition of an affirmative restraint "does not inexorably lead to the conclusion that the government has imposed punishment." 521 U.S. at 363 (internal quotation omitted). Likewise here, while we agree with the Does that § 692A.2A does impose an element of affirmative disability or restraint, we believe this factor ultimately points us to the importance of the next inquiry: whether the law is rationally connected to a nonpunitive purpose, and whether it is excessive in relation to that purpose.

This final factor – whether the regulatory scheme has a "rational connection to a nonpunitive purpose" – is the "most significant factor" in the *ex post facto* analysis. *Smith v. Doe*, 538 U.S. at 102. The requirement of a "rational connection" is not demanding: A "statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id*. at 103. The district court found "no doubt" that § 692A.2A has a purpose other than punishing sex

offenders, 298 F.Supp.2d at 870, and we agree.  In light of the high risk of recidivism posed by sex offenders, *see Smith v. Doe*, 538 U.S. at 103, the legislature reasonably could conclude that § 692A.2A would protect society by minimizing the risk of repeated sex offenses against minors.

The district court nonetheless concluded that the statute is excessive in relation to this purpose, because the law applies "regardless of whether a particular offender is a danger to the public."  298 F.Supp.2d at 871.  The absence of a particularized risk assessment, however, does not necessarily convert a regulatory law into a punitive measure, for "[t]he *Ex Post Facto* Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences."  *Smith v. Doe,* 538 U.S. at 103. The Supreme Court over the years has held that restrictions on several classes of offenders are nonpunitive, despite the absence of particularized determinations, including laws prohibiting the practice of medicine by convicted felons, *Hawker v. New York*, 170 U.S. 189, 197 (1898), laws prohibiting convicted felons from serving as officers or agents of a union, *De Veau v. Braisted,* 363 U.S. 144, 160 (1960) (plurality opinion); *id*. at 160-61 (opinion of Brennan, J.), and of course laws requiring the registration of sex offenders.  *Smith v. Doe*, 538 U.S. at 106.

In this case, we conclude that a categorical rule is consistent with the legislature's regulatory purpose and not "excessive" within the meaning of the Supreme Court's decisions.  While the Does argue that the legislature must tailor restrictions to the individual circumstances of different sex offenders, we view this position as inconsistent with the Supreme Court's direction that the "excessiveness" prong of the *ex post facto* analysis does not require a "close or perfect fit" between the legislature's nonpunitive purpose and the corresponding regulation.  The evidence presented at trial suggested that convicted sex offenders as a class were more likely to commit sex offenses against minors than the general population.  Dr. McEchron indicated that "there are never any guarantees that [sex offenders] won't reoffend," (Appellant's App. at 162), and  Mr. Allison testified that "any sex offender is always going to be of some concern forever."  (T. Tr. at 279).

More specifically, in Allison's view, even an offender who committed a crime involving an older victim, such as statutory rape, would be of concern around a day care or elementary school, although the concern may be reduced, (T. Tr. at 278), and Dr. Rosell testified that while he believed that a sex offender who committed an offense with a 14 or 15-year-old victim was likely to stay in that age range, there also was no way to predict whether a sex offender would "cross over" in selecting victims from adults to children or males to females. (Appellee's App. at 149, 184). Dr. Rosell was less than definitive about the degree to which sex offenders' future behavior was predictable and avoidable; while he personally did not believe residential proximity made "that big of a difference," he agreed that "what works in criminal justice is imprecise at best," and testified that "[t]here is always a risk" of reoffense. (Appellee's App. at 193, 195, 190). In view of the higher-than-average risk of reoffense posed by convicted sex offenders, and the imprecision involved in predicting what measures will best prevent recidivism, we do not believe the Does have established that Iowa's decision to restrict all such offenders from residing near schools and child care facilities constitutes punishment despite the legislature's regulatory purpose.

The Does also urge that the law is excessive in relation to its regulatory purpose because there is no scientific evidence that a 2000-foot residency restriction is effective at preventing sex offender recidivism. "The excessiveness inquiry of our *ex post facto* jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy," but rather an inquiry into "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith v. Doe*, 538 U.S. at 105. In this case, there was expert testimony that reducing the frequency of contact between sex offenders and children is likely to reduce temptation and opportunity, which in turn is important to reducing the risk of reoffense. None of the witnesses was able to articulate a precise distance that optimally balanced the benefit of reducing risk to children with the burden of the residency restrictions on sex offenders, and the Does' expert acknowledged that "[t]here is nothing in the literature that has addressed proximity." (Appellee's App. 198; *accord id.* at 41, 47-48 (testimony of Dr. McEchron)). As

-30-

even Dr. Rosell admitted, we just "don't know" that the Iowa Legislature "isn't ahead of the curve."  (*Id*. at 198).

We believe the legislature's decision to select a 2000-foot restriction, as opposed to the other distances that were considered and rejected, is reasonably related to its regulatory purpose.  Given the challenge in determining precisely what distance is best suited to minimize risk to children without unnecessarily restricting sex offenders, and the difficult policy judgments inherent in that choice, we conclude that the Does have not established the "clearest proof" that Iowa's choice is excessive in relation to its legitimate regulatory purpose, such that a statute designed to be nonpunitive and  regulatory should be considered retroactive criminal punishment.[6]

\*          \*          \*

The judgment of the district court is reversed, and the case is remanded with directions to enter judgment in favor of the defendants.

MELLOY, Circuit Judge, concurring and dissenting.

I join in the majority's opinion, sections I through IV.  However, I dissent as to section V because I believe section 692A.2A is an unconstitutional ex post facto law.

---

[6]In view of our conclusion that the statute is not punitive, it follows that the law is not a "cruel and unusual punishment" in violation of the Eighth Amendment.  *See Smith v. Doe*, 538 U.S. at 97 (explaining that factors used in determining whether law is punishment for *ex post facto* purposes "have their earlier origins in cases under the Sixth and Eighth Amendments"); *Trop v. Dulles*, 356 U.S. 86, 94-99 (1958) (plurality opinion).  Even assuming that § 692A.2A were punitive, we would agree with the district court that the law is neither barbaric nor grossly disproportionate to the offenses committed by the Does.  We therefore reject the Eighth Amendment argument urged by the appellees as an alternative ground for affirming the district court.

The U.S. Constitution prohibits states from passing ex post facto laws. U.S. Const. art. I, § 10, cl. 1. "'Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed,'" is an ex post facto law. Stogner v. California, 539 U.S. 607, 612 (2003) (quoting Calder v. Bull, 3 U.S. 386, 390 (1798)).

As set out by the majority, the fundamental question the Court must decide is whether the residency requirement amounts to punishment. We do so by first asking whether the legislature intended the statute to be punitive. If the answer is in the affirmative, that ends our inquiry, and we find the legislation to be an ex post facto law. However, if the legislature intended the statute to be nonpunitive, "we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." Smith v. Doe, 538 U.S. 84, 92 (2003) (internal quotations and citation omitted). I agree with the majority that the purpose of section 692A.2A is to protect the public. This purpose is nonpunitive, so we must determine if the statute "is so punitive either in purpose or effect as to negate the State's intention to deem it civil." Id.

I also agree with the majority that the factors outlined in Smith should guide our analysis. However, I part ways with the majority as to how some of the individual factors should be examined and as to the final outcome of the multi-factor analysis.

1. **Have measures like the residency restriction historically been regarded as punishment?**

The majority concedes that banishment has historically been regarded as punishment, but points out how the residency restriction differs from banishment. The majority concludes that section 692A.2A is not the type of law that has historically been regarded as punishment. I would find that, although section 692A.2A does not amount to full banishment, it sufficiently resembles banishment to make this factor weigh towards finding the law punitive.

The district court made the following factual findings on the availability of housing:

> [S]ex offenders are completely banned from living in a number of Iowa's small towns and cities. In the state's major communities, offenders are relegated to living in industrial areas, in some of the cities' most expensive developments, or on the very outskirts of town where available housing is limited. Although some areas are completely unrestricted, these are either very small towns without any services, or farmland.

> *    *    *

> In larger cities such as Des Moines and Iowa City, the maps show that the two thousand foot circles cover virtually the entire city area. The few areas in Des Moines, for instance, which are not restricted, include only industrial areas or some of the city's newest and most expensive neighborhoods. In smaller towns that have a school or childcare facility, the entire town is often engulfed by the excluded area. In Johnson County alone, the towns of Lone Tree, North Liberty, Oxford, Shueyville, Solon, Swisher and Tiffin are wholly restricted to sex offenders under § 692A.2A. Unincorporated areas and towns too small to have a school or childcare facility remain available, as does the country, but available housing in those areas is not necessarily readily available.

These findings are not clearly erroneous and should therefore be upheld. See Fed. R. Civ. P. 52(a). In its findings, the district court demonstrated how difficult it is for sex offenders to find legal housing in many communities in Iowa due to the housing restriction. It is common that offenders may not return to live in the community they lived in before incarceration, the place where their families live, and/or the place they find work. There are so few legal housing options that many offenders face the choice of living in rural areas or leaving the state. The difficulty in finding proper housing effectively prevents offenders from living in many Iowa communities. This effectively results in banishment from virtually all of Iowa's cities and larger towns.

-33-

In Smith, the Supreme Court drew a distinction between Alaska's sex offender registry and colonial punishments such as shaming, branding, and banishment. The Court found that the registry merely involved "dissemination of information," whereas the colonial punishments "either held the person up before his fellow citizens for face-to-face shaming or *expelled him from the community*." Smith, 538 U.S. at 98 (emphasis added). It described the aim of these colonial punishments as making "offenders suffer permanent stigmas, which in effect cast the person out of the community." Id. (internal quotation and citation omitted). The residency requirement is a permanent stigma as well as a law that effectively casts the person out of the community. Further, Smith also described as banishment situations in which individuals "could neither return to their original community nor, reputation tarnished, be admitted easily into a new one." Id. Under this phrasing, section 692A.2A fits the description of banishment.

Of course, the residency restriction does not prevent offenders from living in every community, nor from visiting communities in which they are not allowed to live. In this way, the law differs from complete banishment. However, preventing offenders from making a home in many Iowa communities after they have served their sentence does have substantial similarity to banishment. To the extent that offenders are effectively banished from their desired places of residence, I would find this factor weighs in favor of finding section 692A.2A punitive.

2.      **Does the residency restriction promote traditional aims of punishment?**

The residency restriction serves a traditional aim of punishment: deterrence. The majority attempts to minimize the deterrent effect of the statute by arguing that the statute does not increase the negative consequences for an action, but merely reduces the opportunity for that action to occur. In my view, this distinction is not important. One major reason we use the punishments we do, such as imprisonment, is to reduce the likelihood of future crimes by depriving the offender of the opportunity to commit those crimes. There is clearly a deterrent purpose at work in section 692A.2A, thus the measure promotes a traditional aim of punishment.

### 3. Does the residency restriction impose an affirmative disability or restraint?

The majority acknowledges that the residency requirement imposes an affirmative disability or restraint, and I agree. It restricts offenders from living in certain areas. Offenders that live within the restricted areas face criminal penalties. In this way, the restraint differs greatly from the sex offender registry in Smith. The Court in that case pointed out that offenders were "free to change . . . residences." Smith, 538 U.S. at 100. The Court also noted that there was no evidence that the measure disadvantaged the offenders in finding housing. Id. I would find that the affirmative disability or restraint intrinsic in the residence requirement distinguishes it from the sex offender registry in Smith and weighs in favor of finding the law punitive.

### 4. Does the residency restriction have a rational connection to a nonpunitive purpose?

I agree with the majority that section 692A.2A has a rational connection to the nonpunitive purpose of protecting the public. See In Interest of S.M.M., 558 N.W.2d 405, 408 (Iowa 1997).

### v. Is the residency restriction excessive?

Though I believe a rational connection exists between the residency restriction and a nonpunitive purpose, I would find that the restriction is excessive in relation to that purpose. The statute limits the housing choices of all offenders identically, regardless of their type of crime, type of victim, or risk of re-offending. The effect of the requirement is quite dramatic: many offenders cannot live with their families and/or cannot live in their home communities because the whole community is a restricted area. This leaves offenders to live in the country or in small, prescribed areas of towns and cities that might offer no appropriate, available housing. In addition, there is no time limit to the restrictions.

Also, the residency restriction applies to plaintiffs who are not the most serious sex offenders. There is no doubt a class of offenders that is at risk to re-offend and

for whom such a restriction is reasonable. However, the restriction also applies to John Doe II, who pleaded guilty to third degree sexual abuse for having consensual sex with a fifteen-year-old girl when he was twenty years old. The restriction applies to John Doe VII, who was convicted of statutory rape under Kansas law. His actions which gave rise to this conviction would not have been criminal in Iowa. The restriction applies also to John Doe XIV, who pleaded guilty to a serious misdemeanor charge in 1995 after he exposed himself at a party at which a thirteen-year-old girl was present. John Doe XIV was nineteen at the time of his offense. The actions of these and other plaintiffs are serious, and, at least in most cases, illegal in this state. However, the severity of residency restriction, the fact that it is applied to all offenders identically, and the fact that it will be enforced for the rest of the offenders' lives, makes the residency restriction excessive.

In my view, four factors weigh in favor of finding the statute punitive, while only one weighs in favor of finding the statute nonpunitive. The analysis leads me to the conclusion that the residency restriction is punitive. Because the imposition of the residency requirement "'changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed,'" Stogner, 539 U.S. at 612 (quoting Calder, 3 U.S. at 390), I would find Section 692A.2A is an unconstitutional ex post facto law that cannot be applied to persons who committed their offenses before the law was enacted.

_____