**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 18, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JUSTON SHAW,

      Plaintiff - Appellant

v.

ROBERT PATTON, in his official
capacity as Director of the
Oklahoma Department of
Corrections,

      Defendant - Appellee.

No. 15-6106

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:14-CV-00124-W)**
_____

Brady R. Henderson (Ryan Kiesel, with him on the briefs), American Civil
Liberties Union of Oklahoma Foundation, Oklahoma City, Oklahoma, for
Plaintiff-Appellant.

Justin P. Grose, Assistant Attorney General, Oklahoma Attorney General's
Office, Oklahoma City, Oklahoma, for Defendant-Appellee.
_____

Before **HARTZ**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

In 1998, Mr. Juston Shaw was convicted in Texas state court on a

charge of sexual assault. Roughly ten years later, he moved to Oklahoma.

When he did, his sexual-assault conviction triggered application of the Oklahoma Sex Offenders Registration Act. Under this statute, Mr. Shaw incurred an obligation, as long as he lived in Oklahoma, to

- regularly report to a local police department in Oklahoma,

- refrain from living within 2,000 feet of a school, playground, park, or child care center, and

- refrain from loitering within 500 feet of a school, playground, park, or child care center.[1]

Okla. Stat. tit. 57, §§ 583(C)(3), 584, 590 (Supp. 2009); Okla. Stat. tit. 21, § 1125(A) (Supp. 2014).

In Mr. Shaw's view, these obligations constitute retroactive punishment in violation of the U.S. Constitution's *Ex Post Facto* Clause. U.S. Const. art. I, § 10, cl. 1.[2] Thus, Mr. Shaw sued the Director of the Oklahoma Department of Corrections, who is responsible for enforcing the sex-offender regulations.[3] After a bench trial, the district court entered

---

[1] The loitering restrictions are subject to exceptions that do not apply to Mr. Shaw's circumstances. Okla. Stat. tit. 21, § 1125(C), (D) (Supp. 2014).

[2] Mr. Shaw also alleged violation of the Privileges and Immunities Clause (U.S. Const. art. IV, § 2) and the Equal Protection Clause (U.S. Const. amend. XIV, § 1). The district court dismissed both of these claims, and Mr. Shaw does not address these claims in the appeal.

[3] Mr. Shaw also sued Mr. Bill Citty, Chief of the Oklahoma City Police Department, but the parties stipulated to dismissal of all claims against Mr. Citty.

judgment against Mr. Shaw, holding that the statute's retroactive application did not amount to punishment.

On appeal, we ask: Do Mr. Shaw's restrictions on reporting, residency, and loitering constitute retroactive punishment in violation of the *Ex Post Facto* Clause? We conclude that these restrictions do not constitute punishment. Thus, enforcement of these restrictions does not violate the U.S. Constitution.[4]

## I.   The Oklahoma statute was enforced retroactively against Mr. Shaw.

The defendant denies that the Oklahoma statute was enforced retroactively, arguing that the statute was inapplicable to Mr. Shaw until he entered Oklahoma. In our view, however, the statute was enforced retroactively.[5]

It is true that Mr. Shaw was not subject to the Oklahoma statute until he moved to Oklahoma, but the date of his move does not affect whether

---

[4]   The defendant argues that the district court should not have allowed introduction of a map at the trial. Appellee's Resp. Br. at 23-26. But because we affirm the district court's judgment in favor of the defendant, the map does not affect the outcome and we express no view on the map's admissibility.

[5]   Mr. Shaw asserts that a cross-appeal was necessary for us to entertain this argument. We disagree. A cross-appeal is necessary only if the appellee asks us to alter the judgment. *See Montgomery v. City of Ardmore*, 365 F.3d 926, 944 (10th Cir. 2004). Here, the defendant is merely asking us to affirm on alternative grounds. That request did not require a cross-appeal. *See United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 958 (10th Cir. 2011).

the statute is being enforced retroactively. A statute is enforced retroactively if it governs conduct that preceded the statute's enactment. *Stogner v. California*, 539 U.S. 607, 612-13 (2003). That is the case here: Mr. Shaw is subject to statutes enacted in 2009 and 2014 for conduct that took place in 1998.

In 1998, when Mr. Shaw was convicted, Oklahoma did not have any residency or loitering restrictions for sex offenders. Oklahoma did require reporting for sex offenders in 1998, but that requirement would already have expired for Mr. Shaw. *See* Act of May 27, 1997, ch. 260 § 4, 1997 Okla. Sess. Laws 1423-24 (codified as amended at Okla. Stat. tit. 57, § 583(C) (Supp. 1997) (reporting requirement for ten years)); Act of May 20, 2003, ch. 223, 2003 Okla. Sess. Laws 948-49 (codified as amended at Okla. Stat. tit. 57, § 590 (Supp. 2003)[6] (enacting residency restrictions)). Thus, Mr. Shaw is subject to restrictions on reporting, residency, and loitering only because Oklahoma changed its laws years after Mr. Shaw's criminal conduct. By definition, these restrictions are being retroactively applied to Mr. Shaw. The resulting issue is whether these restrictions constitute punishment.

---

[6] The sex-offender residency restrictions are now codified at Okla. Stat. tit. 57, §§ 590-590.1.

4

**II.    We consider only the statutory provisions applicable to Mr. Shaw's circumstances.**

Mr. Shaw challenges the application of Oklahoma's sex-offender requirements to his circumstances. Thus, we consider only the provisions that affect Mr. Shaw. *See Reno v. Flores*, 507 U.S. 292, 300 (1993) (explaining that an as-applied challenge is limited to review of how a statute has been "applied in a particular instance"). Thus, we must determine which of the challenged provisions were applied to Mr. Shaw's circumstances.

Mr. Shaw challenges six statutory provisions applicable to sex offenders. Three of the provisions (reporting, residency, and loitering) affect him. But the other three provisions do not:

1.    Sex offenders cannot provide services to children, work on school grounds, or work for a person who contracts for work to be performed on school grounds. Okla. Stat. tit. 57, § 589(A) (Supp. 2009).

2.    Sex offenders generally cannot live with another convicted sex offender in a single dwelling (subject to certain exceptions). Okla. Stat. tit. 57, § 590.1(A) (Supp. 2009).

3.    Aggravated or habitual sex offenders with an Oklahoma driver's license must have the words "Sex Offender" appear on their driver's licenses, and these offenders must renew their driver's licenses every year. Okla. Stat. tit. 47, § 6-111(D) (Supp. 2009).

First, Mr. Shaw did not present evidence of a restriction on his employment opportunities, for he has not tried to work with children, work

5

at a school, or work for a company that conducts business on school grounds.[7]

Second, Mr. Shaw did not present evidence that the statute has actually prevented him from living with another convicted sex offender. Mr. Shaw lives with his common-law wife, and he has not presented any information suggesting that his common-law wife is a convicted sex offender.

Third, the driver's license requirements have not been applied to Mr. Shaw because

- he has not obtained an Oklahoma driver's license and

- he has not alleged or proven designation as an aggravated or habitual sex offender.[8]

Because Mr. Shaw's circumstances do not trigger these restrictions, we need not decide whether they constitute punishment.

---

[7]     Mr. Shaw suggests that the employment restriction "could prevent him" from working in certain professions. Appellant's Opening Br. at 26. But Mr. Shaw has not shown that the employment restrictions actually foreclosed his employment opportunities.

[8]     The Director of the Department of Corrections is also an improper defendant for a challenge to the driver's license regulations. These regulations are enforced by the Commissioner of Public Safety, not the Director of the Department of Corrections. Okla. Stat. tit. 47, § 2-108(A) (2011). Thus, Mr. Shaw's alleged injury is not redressable by the Director of the Department of Corrections. *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 905 (10th Cir. 2012).

6

**III.  The statutory restrictions on reporting and residency do not constitute punishment of Mr. Shaw.**

Mr. Shaw challenges the reporting and residency restrictions based on the U.S. Constitution's *Ex Post Facto* Clause. U.S. Const. art. I, § 10, cl. 1. Because Mr. Shaw does not allege a punitive intent, we consider only whether the statutory restrictions have a punitive effect. This inquiry is guided by five factors; because each factor weighs against a finding of punitive effect, we conclude that application of the reporting and residency restrictions does not constitute punishment under the *Ex Post Facto* Clause.

**A.  We engage in de novo review of the district court's application of the intent-effects test.**

To determine whether Oklahoma's sex-offender regulations served to punish Mr. Shaw, we apply the intent-effects test discussed in *Smith v. Doe*, 538 U.S. 84 (2003). Though the district court applied this test, we engage in de novo review. *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1027 (10th Cir. 2008).

In engaging in de novo review, we begin with the legislature's stated intent. If the legislature intended to impose punishment, our inquiry ends. *Smith*, 538 U.S. at 92. But if the legislature expressed an intent to enact a regulatory scheme that is civil or non-punitive, Mr. Shaw must provide the "clearest proof" of a punitive effect. *Id.*

7

**B.   Mr. Shaw does not argue that the legislature's stated interest is punitive.**

We ordinarily start with the legislature's stated intent. But Mr. Shaw has not argued that the Oklahoma legislature's stated intent is punitive. *See* Appellant's Opening Br. at 20 ("In the present case, Mr. Shaw has not attempted to prove that [the Oklahoma statute's] stated legislative intention was punitive, due to ambivalent evidence."). Thus, we express no view on the Oklahoma legislature's intent in enacting the sex-offender requirements.

**C.   Mr. Shaw has not provided the "clearest proof" that the Oklahoma statute has a punitive effect.**

Instead, we consider whether Mr. Shaw has provided the clearest proof of a punitive effect. For this inquiry, the Supreme Court considered five factors in *Smith v. Doe*:

1.   Do the statutory requirements resemble traditional forms of punishment?

2.   Do the statutory requirements impose an affirmative disability or restraint that is considered punitive?

3.   Do the statutory requirements promote the traditional aims of punishment?

4.   Do the statutory requirements lack a rational connection to a non-punitive purpose?

5.   Are the statutory requirements excessive with respect to the statute's non-punitive purpose?

*Smith*, 538 U.S. at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).[9] In our view, Mr. Shaw does not present the "clearest proof" of a punitive effect from the reporting and residency restrictions.

**1. We do not defer to the Oklahoma Supreme Court's application of the five factors in *Starkey v. Oklahoma Department of Corrections*.**

The Oklahoma Supreme Court considered a similar *ex post facto* challenge in *Starkey v. Oklahoma Department of Corrections*, 305 P.3d 1004 (Okla. 2013). There, a sex offender challenged other statutory provisions, arguing that they violated the Oklahoma Constitution's *Ex Post Facto* Clause. *Starkey*, 305 P.3d at 1031. In addressing this challenge, the Oklahoma Supreme Court used the five *Smith* factors as an analytical framework and concluded that certain parts of the statute amounted to retroactive punishment in violation of the state constitution. *Id.* Mr. Shaw contends that the Oklahoma Supreme Court's analysis under the Oklahoma Constitution controls our analysis under the U.S. Constitution. We disagree.

---

[9] In *Kennedy v. Mendoza-Martinez*, the Supreme Court identified two additional factors bearing on whether a statute is punitive:

1. Does the statute come into play only on a finding of scienter?

2. Does the statute apply only to behavior that is already a crime?

372 U.S. 144, 168 (1963). But the parties have not addressed these factors.

9

Though we defer to state courts' construction of state statutes,[10] Mr. Shaw's *ex post facto* challenge does not turn on statutory construction. The parties do not disagree on the meaning of the reporting and residency restrictions; they disagree only on whether these restrictions are punitive. On this question, we do not defer to the Oklahoma Supreme Court. *See Lindsey v. Washington*, 301 U.S. 397, 400 (1937) (stating that the U.S. Supreme Court defers to the meaning ascribed to state statutes by a state's highest court, but the Supreme Court "will determine for itself" whether that meaning violates the U.S. Constitution's *Ex Post Facto* Clause).

Deference to the state court would be particularly inappropriate here because the Oklahoma Supreme Court evaluated the statute's constitutionality under the Oklahoma Constitution, not the U.S. Constitution. *Starkey v. Okla. Dep't of Corrs.*, 305 P.3d 1004, 1030-31 (Okla. 2013). Indeed, the Oklahoma Supreme Court disavowed any obligation to follow federal court precedents on the intent-effects test:

> *Smith* [*v. Doe*] dealt with an interpretation of the Federal Constitution's prohibition on ex post facto laws. Although Oklahoma's ex post facto clause is nearly identical to the Federal Constitution's provisions we are not limited in our interpretation of Oklahoma's constitution. How we apply the "intent-effects" test is not governed by how the federal courts have independently applied the same test under the United

---

[10]     *See Hebert v. Louisiana*, 272 U.S. 312, 316 (1926) ("Whether state statutes shall be construed one way or another is a state question, the final decision of which rests with the courts of the state.").

10

States Constitution as long as our interpretation is at least as protective as the federal interpretation.

*Id.* at 1021 (footnotes omitted). Unlike the Oklahoma Supreme Court, we are not free to disavow our precedents on the intent-effects test. Thus, we apply the five factors based on our precedents, rather than on the Oklahoma Supreme Court's analysis under the Oklahoma Constitution.

### 2. The reporting and residency restrictions do not resemble traditional forms of punishment.

First, we consider whether the reporting and residency restrictions resemble traditional forms of punishment. If the restrictions resemble traditional forms of punishment, the first factor would suggest that the statute's effect is punitive. *Smith*, 538 U.S. at 97-98. In undertaking this inquiry, we survey the historical uses of similar forms of punishment. *See id.* at 97 ("A historical survey can be useful because a State that decides to punish an individual is likely to select a means deemed punitive in our tradition . . . .").

Mr. Shaw contends that the reporting and residency restrictions resemble banishment and probation, which he regards as two historical forms of punishment.[11] Thus, we assess whether the reporting and

---

[11] Mr. Shaw also argues that he is being "shamed" by the disclosure of personal information on the internet and appearance of the words "Sex Offender" on driver's licenses.

First, Mr. Shaw argues that putting his personal information on the internet and in a publicly available database amounts to shaming. But the

11

residency restrictions are analogous to the historical uses of banishment and probation. We conclude that the restrictions are not akin to these historical forms of punishment.[12]

### a. Mr. Shaw's reporting requirements do not resemble probation.

Under the Oklahoma statute, Mr. Shaw must regularly report in person to a local police department and provide detailed personal information. Okla. Stat. tit. 57, § 584(A)(5) (Supp. 2009). According to Mr. Shaw, this reporting requirement resembles the historical punishment of probation. We disagree.

---

Supreme Court rejected this argument in *Smith v. Doe*. *See Smith*, 538 U.S. at 99 ("The . . . principal effect of [placing sex offenders' information on the Internet] [is] to inform the public for its own safety, not to humiliate the offender."). Mr. Shaw does not argue that Oklahoma's internet database is materially different from the internet database at issue in *Smith v. Doe*.

Second, Mr. Shaw argues that the Oklahoma statute's provisions involving driver's licenses for sex offenders resemble shaming as an historical form of punishment. As discussed above, these regulations have not been applied to Mr. Shaw, for he does not have an Oklahoma driver's license and is not an aggravated or habitual sex offender. *See* Part II, above. Because Mr. Shaw brings an as-applied challenge, we decline to address this argument. *See* Part II, above.

[12] "The record before us contains nothing in the way of ethnological or historical data and any reasoning based upon such matters must result from taking judicial notice of the work of scholars which has been incorporated in their writings." *Wadia v. United States*, 101 F.2d 7, 7 (2d Cir. 1939); *see also Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles.").

The Supreme Court has characterized probation as a form of punishment. *United States v. Knights*, 534 U.S. 112, 119 (2001). Nonetheless, the Supreme Court rejected a similar theory with respect to another state's reporting requirements. *Smith*, 538 U.S. at 101-02 (rejecting the argument that the restraint imposed by sex-offender reporting requirements "is parallel to" the restraint imposed by probation). Mr. Shaw argues that Oklahoma's reporting requirements are more onerous than the requirements addressed in *Smith*. But even if Mr. Shaw's reporting requirements are more onerous than the requirements at issue in *Smith*, his requirements differ in three ways from the historical use of probation:

1.  Probation historically concerned a probationer's supervision; but Mr. Shaw's reporting requirements require disclosure of personal information, not supervision.

2.  Historically, probation included multiple conditions beyond regular reporting.

3.  Probation historically operated as a deferred sentence for an underlying offense, but any violation of Mr. Shaw's reporting requirements would entail a criminal prosecution distinct from his underlying offense.

First, Mr. Shaw argues that his regular reporting amounts to "supervision," but he does not furnish evidence for this characterization. Mr. Shaw must regularly provide his address and other personal information to update Oklahoma's sex-offender database. But no specific officer with the Department of Corrections is assigned to consult with Mr. Shaw or to supervise him.

13

Historically, a probation officer took a far more active role in a probationer's life than simply collecting information for a database. Thus, when a probation officer does not actively supervise a probationer, the subject is not "under probation," as it was historically understood. *See* Edwin H. Sutherland & Donald R. Cressey, *Criminology* 473 (8th ed. 1970) (arguing that when a probation officer's supervision is nonexistent, "the system [should] not be called 'probation' and that, instead, it [should] be called [simply a] suspended sentence"). The absence of supervision distinguishes Mr. Shaw's reporting requirements from the historical understanding of probation.

Second, probation historically included multiple conditions beyond regular reporting to law enforcement. When probation was developed in the nineteenth century, typical conditions required probationers to

- accept the first offer of "honorable employment,"

- obtain written consent from a probation officer if the probationer moved or changed jobs,

- report monthly to the probation office,

- conduct oneself "honestly" by "avoiding all evil associations," obeying the law, and abstaining from drugs and alcohol, and

- decline to enter a saloon or any place where liquor is sold or given away.

Lawrence M. Friedman, *Crime & Punishment in American History* 408 (1993); *see also* David Garland, *Punishment and Welfare: A History of*

14

*Penal Strategies* 25 (1985) (listing common early probation conditions that included "detailed surveillance, control of associations, . . . interventions in the offender's family or home life, . . . personal influence or . . . religious conversion"); 1 Neil P. Cohen, *The Law of Probation and Parole* § 7:8 (2d ed. 1999) (listing modern conditions of probation, including (1) restricting access to weapons and alcohol, (2) limiting access to certain places, and (3) requiring employment, financial support of family members, participation in an educational or counseling program, submission to regular searches, submission to a polygraph test, approval of the probation officer before the defendant can move or travel, and regular reporting to the probation office).[13] These common features of probation are absent in the Oklahoma statute. *See State v. Petersen-Beard*, No. 108,061, ___ P.3d ___, slip op. at 17-18 (Kan. Apr. 22, 2016) (to be published).[14]

---

[13] Mr. Shaw's residency restrictions are akin to some modern probation requirements. *See, e.g.*, Fla. Stat. § 948.30(1)(b) (2015) (supplying a probation condition that prohibits certain sex offenders from living within 1,000 feet of a "school, child care facility, park, playground, or other place where children regularly congregate"). But Mr. Shaw has not argued that his residency restrictions resemble probation; instead, he analogizes the residency restrictions to banishment. *See* Part III(C)(2)(b), below. As a result, we decline to address whether the residency restrictions resemble probation.

[14] In *Petersen-Beard*, the Kansas Supreme Court considered an Eighth Amendment challenge to Kansas's registration requirement for sex offenders. *Petersen-Beard*, No. 108,061, slip op. at 1, 24. Kansas required sex offenders to register in person four times a year for the rest of their

Third, Mr. Shaw's reporting requirements are regulatory requirements separate from his underlying sex-offense conviction. In contrast, probation historically involved a "deferred sentence" based on the underlying offense. *See United States v. Johnson*, 941 F.2d 1102, 1111 (10th Cir. 1991) (explaining that a period of probation may involve

---

lives. *Id.* at 3, 16. The defendant in *Petersen-Beard* challenged the constitutionality of Kansas' sex-offender registration requirements under the Eighth Amendment to the U.S. Constitution, rather than the U.S. Constitution's *Ex Post Facto* Clause. Nonetheless, the court applied the *Smith* factors and considered the constitutional tests for the Eighth Amendment and the *Ex Post Facto* Clause identical with respect to whether a state law is punitive. *Id.* at 6; *see also Smith*, 538 U.S. at 97 (explaining that the factors to determine whether a statute constitutes punishment "migrated into" the Court's *ex post facto* jurisprudence, with "earlier origins in cases under the Sixth and Eighth Amendments"). In applying the *Smith* factors, the court rejected the challenger's analogy of an in-person registration requirement to probation:

> While probation/parole may have "reporting" in common in the abstract, this is only one aspect of many conditions attached to these punishments. For example, probationers are subject to searches of their persons and property simply on reasonable suspicion of a probation violation or criminal activity and are subject to random drug tests. They may also be required to avoid "injurious or vicious habits" and "persons or places of disreputable or harmful character"; permit state agents to visit their homes; remain in Kansas unless given permission to leave; work "faithfully at suitable employment"; perform community service; go on house arrest; and even serve time in a county jail.

*Id.*, slip op. at 17-18 (quoting and adopting *Doe v. Thompson*, No. 110,318, ___ P.3d ___, slip op. at 59 (Kan. Apr. 22, 2016) (to be published) (Biles, J., concurring in part and dissenting in part) (quoting Kan. Stat. Ann. § 21-6607(b), (c)). Noting that Kansas's sex-offender statute required registration but none of the other features of probation, the court rejected the challenger's analogy to probation. *Id.* at 18.

16

deferral of a sentence for a specified time-period); *see also* Richard Gray, *Probation: An Exploration in Meaning*, Fed. Probation, Dec. 1986, at 26, 28 (analogizing probation to "conditional discharge" or "pretrial diversion"). Thus, if probationers violate conditions, they ordinarily face revocation of their probation and imprisonment for the underlying offense. *See Black v. Romano*, 471 U.S. 606, 610-11 (1985). In contrast, if a sex offender violates a reporting requirement, "any prosecution [for the violation] is a proceeding separate from the . . . original offense." *Smith*, 538 U.S. at 102.

In our view, the reporting requirements differ from probation as it has been historically understood.

**b.      Mr. Shaw's residency restrictions do not resemble banishment.**

The Oklahoma statute restricts Mr. Shaw from living in certain areas. According to Mr. Shaw, these restrictions amount to banishment because they prevent him from living in "whole neighborhoods." Appellant's Opening Br. at 23; *see also Smith*, 538 U.S. at 98 (classifying banishment as an historical form of punishment). We disagree because Mr. Shaw's residency restrictions differ in two ways from the historical punishment of banishment:

1.      Banishment involved the complete expulsion of an offender from a socio-political community.

17

2. Banishment prohibited an offender from even being present in the jurisdiction.

Under historic common law, banishment resembled deportation, taking the form of "expulsion, or deportation by the political authority on the ground of expediency; punishment by forced exile, either for years or for life; a punishment inflicted upon criminals, by compelling them to quit a city, place or country, for a specified period of time." Beth Caldwell, *Banished for Life: Deportation of Juvenile Offenders as Cruel & Unusual Punishment*, 34 Cardozo L. Rev. 2261, 2302 (2013) (quoting Katherine Beckett & Steven Herbert, *Banished: The New Social Control in Urban America* 10 n.28 (2009)). Thus, societies have typically regarded banishment as a sanction designed to remove an individual from a specific geographic area. *See* Wm. Garth Snider, *Banishment: The History of Its Use and a Proposal for Its Abolition Under the First Amendment*, 24 New Eng. J. on Crim. & Civ. Confinement 455, 476 (1998).

The geographic scope of banishment has evolved with the evolution of socio-political units. In its earliest forms, banished individuals were exiled from a single city or city-state. *See The Oldest Code of Laws in the World: The Code of Laws Promulgated by Hammurabi, King of Babylon, B.C. 2285-2242* 31 (C.H.W. Johns trans., 2000) (banishment under the Hammurabi Code); Israel Drapkin, *Crime & Punishment in the Ancient World* 77 (1989) (banishment under ancient Hebrew law); *id.* at 178

18

(banishment in Ancient Greece); *see also* Corey Rayburn Yung,

*Banishment by a Thousand Laws: Residency Restrictions on Sex Offenders*,

85 Wash. U.L. Rev. 101, 107 (2007) ("Banishment in its early form was the

expulsion of a person from a community or sovereign area.").

As societies expanded geographically, banished individuals were

exiled to far-flung colonies or isolated localities. *See* A. Roger Ekirch,

*Bound for America: The Transportation of British Convicts to the*

*Colonies, 1718-1775*, 17-21 (1987) (banishment under the British Empire

from England to the American colonies); *Exile*, *in* 24 Great Soviet

Encyclopedia 92 (A.M. Prokhorov ed., 1980) (banishment in Russia to

distant localities and banishment in France to the French colonies in South

America and the South Pacific). And in the American colonies, banished

individuals were exiled from entire colonies. *See* Thomas G. Blomberg &

Karol Lucken, *American Penology: A History of Control* 19-20 (2d ed.

2010).

Twentieth-century examples of banishment in American courts have

also ordinarily involved complete expulsion from a geographic area, such

as a town,[15] a county,[16] or a state.[17]

---

[15]    *Ex parte Scarborough*, 173 P.2d 825, 826 (Cal. Dist. Ct. App. 1946).

[16]    *Beavers v. State*, 666 So. 2d 868, 872 (Ala. Crim. App. 1995).

[17]    *State v. Collett*, 208 S.E.2d 472, 473 (Ga. 1974); *People v. Baum*, 231 N.W. 95, 96 (Mich. 1930).

The common feature of banishment, throughout the ages, has been the complete expulsion of an offender from a community. *See* Lawrence M. Friedman, *Crime & Punishment in American History* 40 (1993) (referring to the historical use of banishment as intending to exclude an offender "from the community altogether"); *see also United States v. Ju Toy*, 198 U.S. 253, 269-70 (1905) (Brewer, J., dissenting) (describing banishment as the quitting of "a city, place, or country, for a specific period of time, or for life").[18]

Mr. Shaw has not been expelled from an entire community; he claims only that "vast spaces" have been "declared off limits." Appellant's Opening Br. at 23. His inability to inhabit these areas might substantially affect his residential choices, but this impediment—regardless of its severity—does not constitute expulsion from a community. *See Doe v. Miller*, 405 F.3d 700, 719 (8th Cir. 2005) (concluding that a statute restricting residential areas for sex offenders does not constitute banishment because sex offenders are not expelled from their communities or prohibited from accessing facilities for employment or for any purpose other than establishing a residence).

---

[18] Though Justice Brewer's dissent lacks "value as precedent," it is "the most significant [statement] by the [Supreme] Court on the issue of banishment as punishment." Corey Rayburn Yung, *Banishment by a Thousand Laws: Residency Restrictions on Sex Offenders*, 85 Wash. U.L. Rev. 101, 115-16 (2007).

The residency provisions not only lacked an element of expulsion, but also allowed offenders to conduct activities in the restricted areas. Banishment was different, prohibiting offenders from even being present in the restricted area. *See, e.g.*, J.M. Beattie, *Crime & the Courts in England, 1660-1800* 503-04 (1986) (stating that a return to England after banishment would constitute a capital offense); Thomas G. Blomberg & Karol Lucken, *American Penology: A History of Control* 19-20 (2d ed. 2010) (same in the American colonies); Israel Drapkin, *Crime and Punishment in the Ancient World* 194 (1989) (same in Ancient Greece).

In our view, the residency restrictions do not resemble the historical use of banishment. Mr. Shaw has not been expelled from a community, and he is free to go wherever he wishes in Oklahoma even if he cannot live in some areas.

**3.    The statute does not impose an affirmative disability or restraint that is considered punitive.**

Second, we consider whether the statute imposes an affirmative disability or restraint that is considered punitive. In our view, the statute does not.

**a.    Mr. Shaw's reporting requirements are not sufficiently harsh to constitute an affirmative disability or restraint that is considered punitive.**

Mr. Shaw owns a house that is within 2,000 feet of a school, playground, park, or child care center. As a result, Mr. Shaw cannot reside

21

in his own house and must report weekly to law enforcement as a transient. Okla. Stat. tit. 57, §§ 584(E), 590(A) (Supp. 2009). Even if Mr. Shaw were not a transient, however, he would have to report in person every three months as long as he resides in Oklahoma. Okla. Stat. tit. 57, §§ 583(A), 584(A)(5) (Supp. 2009). These in-person reporting requirements are burdensome; but under our precedents, the burden is not so harsh that it constitutes punishment.[19]

Mr. Shaw points out that Oklahoma's reporting requirements are more burdensome than the reporting requirements found to be non-punitive in *Smith v. Doe*, for Mr. Shaw must report to his local police department

- in person, rather than by mail, and

- more frequently than the sex offender in *Smith*.

But the additional burden does not render Mr. Shaw's requirements punitive in effect.[20]

---

[19]    The district court did not address whether the reporting requirements constitute an affirmative disability or restraint that is considered punitive. But we can affirm the district court's ruling on any ground adequately supported in the record. *Harvey v. United States*, 685 F.3d 939, 950 n.5 (10th Cir. 2012).

[20]    Mr. Shaw committed the sex offense in Texas in 1998. *See* p. 1, above. At that time, Texas law required transient sex offenders (like Mr. Shaw) to report in person every week. *See* 1997 Tex. Sess. Law Serv. Ch. 668 (S.B. 875) (Vernon's). Thus, in the absence of any statutory changes after 1998, Mr. Shaw would have had to comply with this weekly reporting requirement if he had remained in Texas and lacked a regular address. *See Tyson v. State*, __ N.E.3d __, 2016 WL 756366, at *1, *7 (Ind. Feb. 25, 2016) (to be published) (rejecting an *ex post facto* challenge, based on

22

Other circuits have ordinarily held that in-person reporting requirements are not considered punitive. *See United States v. Parks*, 698 F.3d 1, 6 (1st Cir. 2012) (concluding that in-person reporting is inconvenient but not enough to constitute punishment); *Doe v. Cuomo*, 755 F.3d 105, 112 (2d Cir. 2014) (holding that a requirement of quarterly in-person reporting is not punitive); *United States v. Under Seal*, 709 F.3d 257, 265 (4th Cir. 2013) ("Although [a sex offender] is required under [the Sex Offender Registration and Notification Act] to appear periodically in person to verify his information and submit to a photograph, this is not an affirmative disability or restraint." (citation omitted)); *Hatton v. Bonner*, 356 F.3d 955, 964 (9th Cir. 2003) (stating that a California statute's requirement of in-person reporting "is simply not enough to turn [the California statute] into an affirmative disability or restraint"); *United States v. W.B.H.*, 664 F.3d 848, 855, 857-58 (11th Cir. 2011) (concluding that a requirement of frequent, in-person reporting is "not enough" to change a statutory regime from civil and regulatory to criminal and punitive).

Our circuit has not squarely addressed this question, but we implicitly adopted this view in *United States v. Hinckley*, 550 F.3d 926

changes in Indiana's sex-offender reporting law, because the offender had committed a sex offense in Texas in 2002 and would have had reporting obligations if he had remained in Texas).

(10th Cir. 2008), *abrogated on other grounds by Reynolds v. United States*, __ U.S. __, 132 S. Ct. 975 (2012). There, the claimant brought an *ex post facto* challenge to a federal statute requiring in-person reporting for sex offenders. *Hinckley*, 550 F.3d at 927, 935. The claimant argued that *Smith v. Doe* was distinguishable because the challenged federal statute required in-person reporting, and the Alaska statute at issue in *Smith v. Doe* did not. *Id.* at 936-37. We rejected the claimant's argument and concluded that the federal statute's increased burden did not render the statute punitive. *Id.* at 938. *Hinckley* suggests that Mr. Shaw's in-person reporting requirement does not constitute an affirmative disability or restraint that is considered punitive.

We are also guided by precedents addressing other harsh conditions that the Supreme Court has not regarded as punitive. For example, the Supreme Court has held that a lifelong bar on work in a particular industry does not constitute an affirmative disability or restraint that is considered punitive. *See, e.g.*, *Hudson v. United States*, 522 U.S. 93, 104 (1997) (restricting participation in the banking industry); *De Veau v. Braisted*, 363 U.S. 144, 160 (1960) (prohibiting work as a union official); *Hawker v. New York*, 170 U.S. 189, 192-94 (1898) (revocation of a medical license).

A lifelong bar on work in an industry is harsher than Mr. Shaw's reporting requirements. *See Doe v. Cuomo*, 755 F.3d 105, 112 (2d Cir. 2014) (stating that a requirement for sex offenders to report in person

24

every three years is far less burdensome than a loss of livelihood, which the Supreme Court has upheld against *ex post facto* challenges); *Am. Civil Liberties Union of Nev. v. Masto*, 670 F.3d 1046, 1056-57 (9th Cir. 2012) (providing that a state law requiring quarterly fingerprinting and in-person reporting does not constitute an affirmative disability or restraint because "the burden remains less onerous than occupational debarment").[21]

Guided by *Hinckley*, the opinions in other circuits addressing in-person reporting requirements, and Supreme Court precedent addressing harsher restrictions, we conclude that Mr. Shaw's in-person reporting requirements do not constitute an affirmative disability or restraint that is considered punitive.

---

[21]    We note that the Department of Corrections does not monitor Mr. Shaw's whereabouts beyond the requirement of in-person reporting. But courts have held that even continuous monitoring of a sex offender's whereabouts is not sufficiently disabling to be considered punitive. *See, e.g.*, *Belleau v. Wall*, 811 F.3d 929, 937 (7th Cir. 2016) ("Having to wear [a GPS] monitor is a bother, an inconvenience, an annoyance, but no more is punishment than being stopped by a police officer on the highway and asked to show your driver's license is punishment, or being placed on a sex offender registry."); *Doe v. Bredesen*, 507 F.3d 998, 1005 (6th Cir. 2007) (holding that wearing a GPS monitoring device is not a substantial disability, relying in part on the Supreme Court's occupational debarment cases); *State v. Bowditch*, 700 S.E.2d 1, 10-11 (N.C. 2010) (explaining that because the GPS monitoring program did not "detain an offender in any significant way," the program was not punitive even though it also required an offender to allow government officials into the offender's home every 90 days).

**b.** **Mr. Shaw's residency requirements are not sufficiently harsh to constitute an affirmative disability or restraint that is considered punitive.**

Mr. Shaw cannot live within 2,000 feet of a school, playground, park, or child care center. Okla. Stat. tit. 57, § 590(A) (Supp. 2009). Thus, before Mr. Shaw can move, he must verify that his prospective residence is more than 2,000 feet from a school, playground, park, or child care center. This requirement does not constitute an affirmative disability or restraint that is considered punitive.

In *Smith*, the U.S. Supreme Court acknowledged that another state's residency requirements created a burden, but not one sufficiently onerous to be considered punitive. *Smith*, 538 U.S. at 100-101. Mr. Shaw points out that his residency restrictions are more burdensome than the *Smith* restrictions because the Oklahoma statute

- does not leave Mr. Shaw completely "free to change . . . residences" and

- effectively requires Mr. Shaw to verify that a new address complies with the statute before he can move.

*Id.* But the additional burdens imposed by Mr. Shaw's residency restrictions do not amount to a disability or restraint that has a punitive effect. *See Doe v. Miller*, 405 F.3d 700, 721 (8th Cir. 2005) (concluding that a residency restriction imposes an element of affirmative disability or restraint, but not necessarily one that is punitive).

26

In upholding the constitutionality of another state statute, the U.S. Supreme Court reasoned that the statutory restrictions were less harsh than occupational debarment, which is considered nonpunitive. *Smith*, 538 U.S. at 100. The same is true of Oklahoma's residency restrictions. Mr. Shaw might need to consult with Oklahoma law enforcement before changing his residence within Oklahoma, but this inconvenience is surely preferable to a ban on working in a particular field.

Mr. Shaw's residency restrictions are also less disabling than other state laws that require sex offenders to relocate if they live in an area that had been compliant but became non-compliant because of an intervening opening of a nearby school, playground, park, or child care center. In these states, sex offenders face a constant threat of relocation. *See, e.g.*, *Commonwealth v. Baker*, 295 S.W.3d 437, 445 (Ky. 2009) (discussing collateral consequences of the residency restrictions and how sex offenders faced a "constant threat of eviction"); *State v. Pollard*, 908 N.E.2d 1145, 1150 (Ind. 2009) (finding that a "substantial housing disadvantage" exists for sex offenders who have "no way . . . to find . . . permanent home[s]"). Mr. Shaw does not face a similar threat of relocation under the Oklahoma statute.[22]

---

[22] The Oklahoma statute includes a relocation exception for new day care centers or parks. Thus, sex offenders need not relocate if a new day care center or park is built nearby. Okla. Stat. tit. 57, § 590(A) (Supp. 2009).

27

In our view, Oklahoma's residency restrictions are not sufficiently harsh to constitute an affirmative disability or restraint that has a punitive effect.

### 4. The Oklahoma statute does not promote the traditional aims of punishment.

Third, we consider whether the Oklahoma statute promotes the traditional aims of punishment—deterrence and retribution. *Smith*, 538 U.S. at 102. In our view, the Oklahoma statute does not promote these punitive goals more than non-punitive goals.

### a. The Oklahoma statute does not bear a sufficiently strong deterrent effect to make the restrictions punitive.

We may safely assume that Mr. Shaw is correct when he alleges that reporting and residency restrictions deter sex offenses. But Mr. Shaw concedes that the deterrent effect is "less probative" than the other factors used to determine whether the statute is punitive. Appellant's Opening Br. at 27.

Deterrence is not unique to punishment, for any civil regulation likely has some deterrent effect. *See Smith*, 538 U.S. at 102 ("Any number

---

The Oklahoma statute does not provide a relocation exception for new schools. Thus, sex offenders must relocate if a new school is built nearby. *Id.* But Mr. Shaw has not presented evidence that this restriction has been applied to his circumstances, for he has never had to move because a new school was built within 2,000 feet of his residence. Accordingly, we need not decide whether the lack of a relocation exception for schools is so harsh that it constitutes an affirmative disability or restraint that is considered punitive. *See* Part II, above.

of governmental programs might deter crime without imposing punishment."). And Mr. Shaw has not shown that the statute's deterrent effect is sufficiently strong to negate the legislature's non-punitive intent. *See United States v. W.B.H.*, 664 F.3d 848, 858 (11th Cir. 2011) (concluding that a sex offender's reporting requirements lack a sufficiently strong deterrent effect to justify a finding that the requirements are punitive); *Doe v. Bredesen*, 507 F.3d 998, 1005-06 (6th Cir. 2007) (stating that although the sex-offender reporting requirements had some deterrent effect, the strength of the effect was not enough to make the statute punitive); *Doe v. Miller*, 405 F.3d 700, 720 (8th Cir. 2005) (concluding that residency restrictions lack a strong deterrent effect because they do not alter a sex offender's "incentive structure"); *Hatton v. Bonner*, 356 F.3d 955, 965 (9th Cir. 2003) (stating that the deterrent value of sex-offender reporting statutes does not make the statutes punitive). Thus, the reporting and residency restrictions lack a sufficiently strong deterrent effect to render the Oklahoma statute punitive.

**b.      The statute lacks a sufficiently strong retributive effect to render the statute punitive.**

A statute is retributive if it is intended to express condemnation for a crime and to restore moral balance. *Graham v. Florida*, 560 U.S. 48, 71 (2010). Mr. Shaw's reporting and residency restrictions may reflect

29

societal condemnation. But this expression of condemnation is not sufficiently clear or strong to negate the legislature's non-punitive intent.

Mr. Shaw regards his reporting and residency restrictions as retributive because they are applied categorically without regard for his individualized risk to the public. We disagree: the reporting and residency restrictions are consistent with the non-punitive objective of promoting public safety, and Mr. Shaw has not shown that the retributive effect is so strong that it renders the statute punitive.

### i. Mr. Shaw's reporting requirements are consistent with the legislature's non-punitive objective of protecting public safety.

For a statute to be so retributive that it constitutes punishment, Mr. Shaw must show that the statute's effect lacks a reasonable relationship to non-punitive objectives. *Smith*, 538 U.S. at 102.

Mr. Shaw's reporting requirements might have a retributive effect of "vengeance" or "realizing 'justice.'" *Artway v. Attorney Gen. of State of N.J.*, 81 F.3d 1235, 1255 (3d Cir. 1996). But the reporting requirements are also consistent with a non-punitive intent—promoting public safety—by facilitating law enforcement's identification of sex offenders and notification to the public of potential dangers.

Mr. Shaw's reporting requirements are long (as long as he continues to reside in Oklahoma) and frequent (weekly) because

- the Department of Corrections determined that Mr. Shaw's sexual-assault conviction was particularly serious and

- Mr. Shaw is a transient.

The Oklahoma legislature could rationally view the seriousness of Mr. Shaw's offense and his transience as calling for heightened efforts to promote public safety. Thus, Mr. Shaw's long, frequent reporting requirements are "consistent with the [statute's non-punitive] objective." *Smith*, 538 U.S. at 102.

First, Mr. Shaw's reporting requirements were keyed to the seriousness of his underlying sex-offense conviction. The Alaska reporting requirements addressed in *Smith* were also based on a sex offender's risk of re-offense. *Id.* at 90 (requiring multiple-conviction sex offenders to report more frequently and for a longer period of time than single-conviction sex offenders). Though the Oklahoma and Alaska statutes use different methods to determine the severity of an offender's reporting requirements, both statutes linked the severity of the reporting requirements to public safety, making the statutes "consistent with the regulatory objective" of protecting public safety. *Id.* at 102; *see also Hatton v. Bonner*, 356 F.3d 955, 965 (9th Cir. 2003) (concluding that a reporting statute lacked retributive effect when it "tied the length of the reporting requirement to the extent of the [offender's] wrongdoing").

31

Second, Mr. Shaw is a transient, and the Oklahoma legislature could rationally determine that transient sex offenders pose a greater threat to public safety. *See, e.g.*, *Rodriguez v. State*, 108 A.3d 438, 447-48 (Md. Ct. Spec. App. 2015) (concluding that the Maryland legislature "had a legitimate regulatory purpose in enacting additional registration requirements for homeless [sex offenders] [because] [w]ithout frequent in-person registration, law enforcement would be unable to properly monitor these [offenders]"); *Lamberty v. State*, No. 232, 2014, 2015 WL 428581, at *3 (Del. Jan. 30, 2015) (unpublished) ("Requiring a homeless sex offender to register more often assists police in their supervision, and directly contributes to the [statute's] stated purpose of continued monitoring of sex offenders for the public's protection."); *State v. Crofton*, No. 59539-3-I, 2008 WL 2231821, at *2 (Wash. Ct. App. June 2, 2008) (unpublished) (noting that weekly, in-person reporting requirements for homeless sex offenders may be enacted to "protect communities by providing increased access to necessary and relevant information"); *see also* Part III(C)(6)(b), below (discussing the regulation of transient sex offenders).  In light of this consideration, Mr. Shaw's weekly reporting requirement does not render the statute punitive.

In our view, Mr. Shaw's reporting requirements were rationally designed to promote public safety. Mr. Shaw has not demonstrated a clear

32

retributive effect from his weekly reporting requirements that negates the legislature's non-punitive intent.

### ii. Mr. Shaw's residency restrictions are also consistent with the legislature's non-punitive objective of protecting public safety.

Mr. Shaw's residency restrictions are also consistent with a non-punitive objective: reducing recidivism among sex offenders. As discussed below, the Oklahoma legislature could reasonably set out to reduce recidivism by minimizing temptations and opportunities for sex offenders to prey on children. *See* Part III(C)(5)(b), below. In light of the rational connection between the residency restrictions and a reduction in recidivism, this factor also weighs against a finding of a punitive effect. *See Smith*, 538 U.S. at 102 (concluding that a restriction that is "reasonably related to the danger of recidivism" is not considered retributive).

### 5. The Oklahoma statute is rationally related to a non-punitive purpose.

Fourth, we examine the statute's "rational connection to a non-punitive purpose." *Id.* This is the "[m]ost significant factor" in considering the statute's punitive effect. *Id.*

The Oklahoma legislature enacted the statute to "protect[] the public safety" by reducing recidivism among sex offenders, improving law enforcement's ability to identify sex offenders, and enabling law

33

enforcement to alert the public to potential danger from these offenders. *Starkey v. Okla. Dep't of Corrs.*, 305 P.3d 1004, 1020 (Okla. 2013) (quoting 1997 Okla. Sess. Laws 1422); *see id.* at 1028 (discussing the statute's non-punitive objective of promoting public safety). The reporting and residency restrictions are rationally related to these non-punitive purposes.

**a.     The reporting requirements promote public safety.**

The federal district court concluded that the reporting requirements further the legislature's interest in protecting public safety. Dist. Ct. Op. at 21. We agree. *See United States v. Under Seal*, 709 F.3d 257, 265 (4th Cir. 2013) (concluding that notifying the public about the risk of sex offenders in the community is rationally tied to public safety).

Mr. Shaw does not present any arguments to rebut the relationship between the reporting requirements and public safety. To the contrary, Mr. Shaw points to one detective's testimony, who explained that the reporting requirements are "helpful in investigating sex crimes." Appellant's Opening Br. at 30.

The reporting requirements are rationally related to a non-punitive purpose, which weighs against a finding of a punitive effect.

34

**b.** **The residency restrictions are rationally related to a concern for public safety.**

The federal district court also concluded that the residency restrictions are rationally related to the Oklahoma legislature's concern for public safety. Dist. Ct. Op. at 21. We agree.

Mr. Shaw argues that the restrictions are not tied to public safety because the restrictions

- do not provide additional information for sex-crime investigations and

- increase the rate of homelessness among sex offenders.

We reject both arguments.

First, the residency restrictions need not facilitate sex-crime investigations in order to be tied to a non-punitive purpose. Instead, the residency restrictions are rationally designed to reduce sex offenders' temptations and opportunities to re-offend. *See Doe v. Miller*, 405 F.3d 700, 716, 720 (8th Cir. 2005) (holding that a 2,000-foot residency restriction is rationally designed to reduce recidivism by reducing temptation for sex offenders); *State v. Pollard*, 908 N.E.2d 1145, 1152 (Ind. 2009) (stating that residency restrictions for sex offenders will "reduce the likelihood of future crimes by depriving the offender[s] of the opportunity to commit those crimes"); *see also* Cynthia Calkins, Elizabeth Jeglic, et al., *Sexual Violence Legislation: A Review of Case Law and Empirical Research*, 20 Psychol. Pub. Pol'y & L. 443, 453-54 (2014)

35

(stating that legislatures enact residency restrictions to prevent sex offenders from being "near places where children congregate" or "residing within specific distances of child-dense community structures" in an attempt to reduce sex offenders' recidivism rates); Corey Rayburn Yung, *Banishment by a Thousand Laws: Residency Restrictions on Sex Offenders*, 85 Wash. U.L. Rev. 101, 154 (2007).[23]

The Oklahoma legislature's apparent strategy was to keep sex offenders at least 2,000 feet away from large groups of children. "State statutes that impose 2000-foot residency restrictions bear at least some resemblance in their relationship to the interest that the legislation hopes to serve. These restrictions place children out of sight and mind, beyond

---

[23] Professor Yung discusses the rationales ordinarily given for residency restrictions:

> The most common rationale offered in support of [residency restrictions] is that they prevent the temptation of sex offenders in their daily lives. The temptation argument is that sex offenders will not be around children, therefore they will not be tempted to commit a sex offense against them. A secondary, and probably more powerful, argument is that the presence of sex offenders in communities creates opportunities for those offenders to form linkages with potential victims, enabling their future crimes. This second argument is more potent because it acknowledges the overwhelming statistical evidence that child molesters are most often friends or family members of the victims.

Corey Rayburn Yung, *Banishment by a Thousand Laws: Residency Restrictions on Sex Offenders*, 85 Wash. U.L. Rev. 101, 154 (2007). Professor Yung disputes these rationales based on empirical data. *Id.* at 154-56. But Mr. Shaw did not present any such empirical data.

senses that could stir the perversions of known child sex offenders. At least arguably, a 2000-foot restriction reduces opportunity, diminishes temptation, and thereby decreases the risk that a proven child sex offender will reoffend." *People v. Leroy*, 828 N.E.2d 769, 792 (Ill. Ct. App. 2005) (Kuehn, J., dissenting). At trial, Mr. Shaw did not present any evidence questioning the reasonableness of the Oklahoma legislature's strategy to reduce sex offenders' temptations and opportunities through residency restrictions.

Second, Mr. Shaw argues that the residency restrictions increase homelessness among sex offenders. In his view, he was made homeless by the Oklahoma statute. We disagree. Mr. Shaw is a transient because he failed to verify that his residence complied with the Oklahoma statute's residency restrictions.[24]

In our view, the residency restrictions are rationally related to the legislature's concern with public safety.

---

[24] This might be a different case if Mr. Shaw was forced out of his home because a school was built within 2,000 feet of his residence, but Mr. Shaw has not presented any evidence that he was forced out by a newly built school. *Cf. Commonwealth v. Baker*, 295 S.W.3d 437, 445-46 (Ky. 2009) (explaining that the Kentucky sex-offender regulation statute caused sex offenders to "face[] a constant threat of eviction" from newly built schools and parks and that the state statute at issue has "inherent flaws," preventing a rational connection between the Kentucky statute and a non-punitive purpose); *see also* Part II, above. Mr. Shaw is unable to live in his home because he failed to verify that it complied with the residency restrictions; he was not pushed into homelessness by the residency restrictions.

37

**6.      The Oklahoma statute is not excessive in relation to concerns for public safety.**

Fifth, we consider whether the statute is excessive in relation to its non-punitive purpose. *Smith*, 538 U.S. at 103. In conducting this inquiry, we do not consider whether the Oklahoma legislature made the "best choice possible." *Id.* at 105. Instead, we consider only whether the statute reasonably promotes a non-punitive objective. *Id.* In our view, the statute does so.

**a.      A statute is excessive if it categorically imposes disabilities or restraints that are particularly harsh.**

The Supreme Court has generally endorsed rules that apply categorically. *See, e.g.*, *id.* at 103 ("The *Ex Post Facto* Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences."); *see also Doe v. Miller*, 405 F.3d 700, 721 (8th Cir. 2005) ("The absence of a particularized risk assessment . . . does not necessarily convert a regulatory law into a punitive measure."). But particularly harsh disabilities or restraints, when applied categorically, can be excessive in relation to a non-punitive purpose. *See, e.g.*, *Kansas v. Hendricks*, 521 U.S. 346, 357-58, 364 (1997) (civil commitment for sexually violent predators); *see also Smith*, 538 U.S. at 104 ("The magnitude of the restraint [at issue in *Kansas v. Hendricks*] made individual assessment appropriate."). Thus, to avoid a punitive effect, a statute imposing a

38

particularly harsh disability or restraint must allow an individualized assessment. An individualized assessment helps to ensure that a statute's particularly harsh disability or restraint is rationally related to a non-punitive purpose.

For example, in *Kansas v. Hendricks*, a Kansas statute imposed civil commitment on certain individuals diagnosed with a "mental abnormality or personality disorder" that predisposed them "to commit sexually violent offenses." 521 U.S. at 352. Though the Kansas statute retroactively imposed a severe restriction—civil commitment—this restriction was not excessive because an individualized medical diagnosis was necessary for the civil commitment. *See United States v. Salerno*, 481 U.S. 739, 746-49 (1987) (holding that pretrial detention for certain arrestees did not constitute punishment, in part because arrestees were individually evaluated for dangerousness).

**b.    Mr. Shaw's reporting requirements are not excessive because they are not particularly harsh and reflect a reasonable legislative judgment.**

Mr. Shaw must report to his local police department in person—either weekly or quarterly, depending on whether he remains transient—as long as he lives in Oklahoma. Okla. Stat. tit. 57, § 584(A)(5), (G) (Supp. 2009). These reporting requirements are reasonable in light of the statute's non-punitive purpose of protecting public safety. To further that non-punitive purpose, the Oklahoma legislature could reasonably have based

39

the reporting requirements on the severity of the sex offense and the offender's transience.

In *Smith*, the Supreme Court explained that "the . . . minor condition of registration," even if required on a regular basis for the duration of an offender's life, is not excessive. *Smith*, 538 U.S. at 104. Similarly, the Oklahoma legislature could reasonably have decided to impose stricter requirements on transient sex offenders because of a heightened public-safety concern.[25] *See* Part III(C)(4)(b)(i), above (citing authorities for the reasonableness of a legislature's decision to impose greater reporting requirements on sex offenders that are transient than on those with stable residences).

We do not regard Mr. Shaw's reporting requirements as excessive because the requirements further the statute's non-punitive purpose of protecting public safety.

---

[25] Nine other states require transient sex offenders to report in-person every week. Ala. Code § 15-20A-12(b) (2015); Idaho Code § 18-8308(4) (2015); 730 Ill. Comp. Stat. 150/6 (2014); Ind. Code § 11-8-8-12(c) (2014); Md. Code Ann., Crim. Proc. § 11-705(d)(2) (LexisNexis 2015); Minn. Stat. § 243.166(3a)(e) (2014); Tex. Code Crim. Proc. Ann. art. 62.051(h)(1)-(2) (West Supp. 2015); Wash. Rev. Code § 9A.44.130(6)(b) (Supp. 2016); Wyo. Stat. Ann. § 7-19-302(e) (2015). Another ten states require reporting every month or quarter. Ark. Code Ann. § 12-12-909(a)(6) (Supp. 2015); Cal. Penal Code § 290.011(a) (Deering Supp. 2016); Fla. Stat. § 943.0435(4)(b)(2) (2015); Haw. Rev. Stat. § 846E-5 (2014); Kan. Stat. Ann. § 22-4905(e) (Supp. 2014); Mass. Gen. Laws ch. 6, § 178F (2012); Mont. Code Ann. § 46-23-504(5) (2015); Nev. Rev. Stat. § 179D.470(3) (2015); 42 Pa. Cons. Stat. § 9799.15(h)(1) (2014); Tenn. Code Ann. § 40-39-203(f) (Supp. 2015).

### c. The residency restrictions represent a reasonable legislative judgment, and Mr. Shaw has not demonstrated that the residency restrictions are excessive for his circumstances.

Mr. Shaw's residency restrictions are not excessive as applied to his circumstances. As discussed above, residency restrictions are generally designed to reduce temptations and opportunities for sex offenders to prey on children. *See* Part III(C)(5)(b), above. The legislature could reasonably try to advance this goal by creating a categorical rule for sex offenders. *See Doe v. Miller*, 405 F.3d 700, 721-22 (8th Cir. 2005) (concluding that categorical, class-based restrictions are not excessive if the restrictions further a legislature's regulatory purpose); *see also People v. Mosley*, 344 P.3d 788, 802 (Cal. 2015) (concluding that statutory residency restrictions for sex offenders "seem . . . no harsher" than occupational debarment, which the Supreme Court has said is nonpunitive and not excessive).

And Mr. Shaw has not presented evidence that the residency restrictions are excessive in his circumstances. For example, he has not shown that his own risk of recidivism is particularly low or that the residency restriction goes beyond what is necessary in his circumstances. *See Miller*, 405 F.3d at 722-23 (deferring to the legislature on the precise distance and specifics of a residency restriction).

Under these circumstances, we conclude that the legislature could reasonably set out to reduce recidivism by restricting where sex offenders

41

can live. As a result, the residency restrictions did not create an excessive burden on sex offenders.

**IV. Mr. Shaw did not preserve or adequately challenge the loitering restrictions.**

Mr. Shaw argues that Oklahoma's loitering restrictions amount to an affirmative disability or restraint that is considered punitive. *See* Appellant's Opening Br. at 26. But we reject this argument because it was forfeited in district court and is not adequately argued on appeal.

First, Mr. Shaw did not argue to the district court that Oklahoma's loitering restrictions constitute retroactive punishment. *See* Appellant's App'x at 37-38 (Final Pretrial Report). As a result, this argument was forfeited. *See United States v. Battles*, 745 F.3d 436, 445 n.9 (10th Cir. 2014). Ordinarily, this argument would be reviewable under the plain error standard. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011). But Mr. Shaw has not urged plain error; as a result, we decline to consider the new argument. *See id.* at 1130.

Second, Mr. Shaw has not adequately addressed the intent-effects test for the loitering restrictions. For these restrictions, Mr. Shaw addresses only one of the five *Smith* factors: the existence of an affirmative disability or restraint that is considered punitive. But he does not discuss how the other four factors would apply to the loitering restrictions. Thus, Mr. Shaw has not provided "the clearest proof" that the loitering restrictions have a

punitive effect. *See Lehman v. Penn. State Police*, 839 A.2d 265, 271 (Penn. 2003) (stating that the existence of an affirmative disability or restraint, in itself, does not provide the clearest proof of a punitive effect); *see also State v. Eighth Judicial Dist. Court (Logan D.)*, 306 P.3d 369, 388 (Nev. 2013) (holding that a state sex-offender law was not punitive when only one factor indicated a punitive effect); *DeVita v. District of Columbia*, 74 A.3d 714, 721 (D.C. 2013) (holding that proof of a single *Smith* factor "is certainly not enough to provide 'the clearest proof'" of a punitive effect).

## V. Conclusion

We affirm. Mr. Shaw does not argue that the Oklahoma legislature had a punitive intent, and he has not provided the clearest proof of the restrictions' punitive effect. As a result, we affirm the judgment for the defendant.[26]

---

[26] Because Mr. Shaw brought an as-applied challenge, our conclusion is limited to Mr. Shaw's circumstances.